# In re Gary Pray

[336 A.2d 174]

No. 203-73

Present: Barney, C.J., Smith, Keyser, and Daley, JJ. and Shangraw, C.J. (Ret.), Assigned

Opinion Filed April 1, 1975

*Robert Edward West,* Defender General and *Gregory A. McKenzie,* Deputy Defender General, Montpelier, for Petitioner.

*M. Jerome Diamond,* Attorney General and *William Keefe,* Assistant Attorney General, Montpelier, for the State.

**Barney, C.J.** This is a post-conviction proceeding following a conviction of murder in the first degree. A mandatory appeal in the matter was affirmed in *State* v. *Pray,* 130 Vt. 613, 298 A.2d 859 (1972). In the proceedings below on this petition relief was denied, but coupled with a recommendation that review be had here. This is that review.

The crucial issues may be summarized as two: the adequacy of the representation of the defendant at and prior to trial, and the medicated condition of the defendant at and before trial with respect to his competency to stand trial. Two other questions relating to claimed specific evidentiary errors will be dealt with under the first issue.

This case was reviewed and decided as a post-conviction matter with great care below. It raises, for this Court, issues of great concern. To fully substantiate the judgment we reach requires some prefatory remarks.

The factual details of the crime involved are set out in *State* v. *Pray, supra,* 130 Vt. 613. Since the manner of conducting the defense, and its adequacy, have been put in issue by new counsel, it is essential to evaluate the circumstances facing trial counsel in preparing a defense. Necessarily, the facts concerning the actual shooting could be said to be unchallengeable. One of the victims, the defendant's mother-in-law, survived, and the whole affair was witnessed by two other persons, one the defendant's wife and the other his sister-in-law. There was no question of identification, and the defendant himself called the police to say he had shot two people. He had set out in his car to find his father-in-law, found him on the road, followed him into his driveway, accosted him, and after an argument, went back to his car, took out a loaded rifle, and shot him.

It was the decision of counsel to defend on the ground of insanity. It seems to be conceded by all parties, and found as a fact by the lower court, that this was the only possible defense.

Tactically, such a defense poses many dilemmas of serious proportions to counsel, and almost always calls for judgment determinations on matters fraught with danger for his client. It may not be enough to minimize the criminal event itself by restrained cross-examination; it may, in some cases, seem necessary to emphasize and highlight the brutality and savagery of the event to establish, at least in the lay mind of a juror, that the criminal acts were irrational. Evidence assumed to add to such a conclusion may be deliberately allowed in, even though otherwise objectionable. Counsel must be free to make such decisions without threat, and courts must be free to accept them. The search for a perfect trial

may be not only endless and costly, but unjust. *See* M. Fleming, *The Price of Perfect Justice* (1974).

Thus, asserted errors raised by other counsel in post-conviction proceedings must be evaluated in the light of the full picture of the defense, and not extracted from context. This is the procedure properly followed by the lower court.

In this light the contentions of error and shortcoming must be examined here, and we will first consider together the allegations of specific errors claimed in allowing evidence in unchallenged, and the general claim of lack of effective assistance of counsel. Although counsel was employed at the expense of the State, he was in fact the attorney selected by the defendant's family.

Bearing in mind that the whole concern of counsel in this case was quite soundly directed at the insanity defense, the alleged improper evidence, consisting of testimony from the defendant's estranged wife, must be tested with that in mind. As the court below indicated, the testimony in support of premeditation did not come only from this source. To deal with this kind of testimony in a way to minimize the degree of the crime might well be, in the judgment of counsel, to reveal to the jury a lack of confidence in the claim of insanity, even though the marital privilege claim lay at hand for exclusionary use. These questions are close and are difficult, and call for the fair judgment of counsel, unfettered by a concern for his personal professional welfare. To have it any other way would have the effect of depriving defendants whose situation is most desperate of those risky defenses which may offer the only road to a favorable judgment by the jury. We cannot find in the admission of the testimony of the wife in this case a basis for a retrial.

Even less so can we find cause for a new trial in the psychiatric testimony in question. The claim is that the psychiatrists were permitted to testify to matters excludable under 13 V.S.A. § 4816(c) and the holding in *State* v. *Miner*, 128 Vt. 55, 70–71, 258 A.2d 815 (1969). This is not to say that the rule is any less stringent than we have previously held, but, instead, it is to be viewed in the light of the circumstances of this case. We agree with the lower court that relief is not justified on the basis of this claim, and, indeed, as that court

found, the testimony complained of could have been, in the competent judgment of counsel, helpful with respect to the only possible defense, that of insanity.

The most troublesome concern with respect to the trial of the defendant was not fully disclosed until these post-conviction hearings. From July 25, 1971, to August 3, 1971, the defendant underwent psychiatric evaluation at the Vermont State Hospital. Arraignment was August 1, 1971. At a hearing prior to trial on October 18, 1971, the defendant overturned a table and attempted to attack Dr. Woodruff, then on the stand. At that time the defendant was in the custody of the State of Vermont and under the influence of drugs administered at the direction of the Vermont State Hospital staff. He was found to be not competent at that time by the court below on account of the medication.

The administration of drugs was either continued in some form or resumed the week prior to trial, and carried through the trial itself at the direction of his State custodians. The dosage was found to be 100 m.g. of thorazine four times a day, 30 m.g. of phenobarbital twice a day, 50 m.g. of tofranil twice a day. There seems to have been an occasional dosage of chlorohydrate. The record is not clear that the prescribed medication was invariably completely taken, but the quantity prescribed brought an expression of astonishment from Dr. Woodruff, the State's psychiatric witness. The trial transcript also reveals that, during the original trial, it was necessary to recess for part of a day in order that the prescribed medication be brought from the Rutland Correctional Center and administered. This was reported to the trial court by defense counsel who expressed fear that the behavior of the defendant might be such as to result in his exclusion from the courtroom, to his prejudice.

The uncontroverted effect of all this medication was to render the defendant quiet and tractable. His counsel testified that, under this dosage, the defendant was rational, appeared well oriented, answered questions clearly, was cooperative, and knew what was going on. His attorney accepted assurances from an attending doctor that the medication did not affect the defense, and, indeed, had no reason to believe otherwise. Since depression played a large part in the claimed insanity defense, any appearance of the defendant at trial that sup-

ported that condition might be viewed as helpful. In any event, since the custody of the defendant was in the State, defense counsel's control over, and understanding of, the actual situation was, by definition, limited.

Two concerns present themselves with respect to medication administered. The first relates to the defendant's competency to stand trial. It is disturbing, to say the least, to have testimony from a State's medical expert, as we have here, that a defendant was not competent to stand trial on a certain date because of the effect of his medication on his mental state. The question must arise as to the validity of a competency that rests on heavy medication. Yet we must agree with the lower court that the evidence as to awareness and ability to communicate to his counsel is sufficient to support the finding of competency. *But see Drope* v. *Missouri,* 420 U.S. 162.

Yet there is more to the matter than the orientation and cooperation of the defendant in his trial. If a defense of insanity has any rational basis, by necessity, absent fraud, the element of cooperation and participation in defense of such a defendant is limited. The more serious question, in the situation of this case, is the impact of a heavily sedated defendant upon the jury's evaluation of his sanity.

The State has the obligation, the duty, to put before the jury all of the relevant facts in its possession. The extent and kind of these mood-altering, mind-affecting drugs was such a fact. The burden could not be shifted to the defendant or his counsel, since the post-conviction hearing clearly established that neither the significance nor the measure of the drugs administered was ever fully revealed to them. These drugs, along with others, are sufficiently powerful and effective to allow the discharge from mental institutions, as able to function in society, persons committed as insane.

In other words, the jury never looked upon an unaltered, undrugged Gary Pray at any time during the trial. Yet his deportment, demeanor, and day-to-day behavior during that trial, before their eyes, was a part of the basis of their judgment with respect to the kind of person he really was, and the justifiability of his defense of insanity. At the very least, they should have been informed that he was under heavy, sedative

medication, that his behavior in their presence was strongly conditioned by drugs administered to him at the direction of the State, and that his defense of insanity was to be applied to a basic behavior pattern that was not the one they were observing. In fact, it may well have been necessary, in view of the critical nature of the issue, to expose the jury to the undrugged, unsedated Gary Pray, at least, insofar as safety and trial progress might permit. A life sentence ought not to rest on the shaky premise that an undisclosed behavioral alteration, brought about by the State, did not affect the jury's resolution of the issue of insanity. The matter must be retried.

*The conviction is set aside and the cause is remanded for a new trial.*