## 43696. EASON v. THE STATE.
### (353 SE2d 188)

PER CURIAM.

A Chatham County jury found the appellant, Fred Eason, Jr., guilty but mentally ill on two counts of murder. The court sentenced Eason to concurrent life sentences. He raises three issues on appeal. We affirm.[1]

Eason's friends and family noticed that he began to act strangely during late January 1985. One week before the killings in question, Eason told his fiancee that he had been "touched by God." Later in the week, he told her that the world would soon come to an end. On the Friday before the killings, Eason told his fiancee that she did not have to go to work because they would soon be in Paradise.

Later that Friday, Eason and his fiancee drove from Springfield, where his mother was hospitalized with cancer, back to Savannah. When they reached Savannah, they stopped first at a Burger King, where Eason told a number of customers that he was Jesus Christ. Eason then went to the Welsh Pawn Shop to purchase crosses.

He found two crosses that suited him, but he did not have enough money to buy the crosses. To raise the money, Eason went to his sister's house, where he sold his El Camino truck, valued at $1,200 according to trial testimony, for $70. That amount proved insufficient, so he pawned his fiancee's stereo and some of her other belongings to finally acquire the crosses. While he was at his sister's house, Eason also burned a doll from his sister's doll collection. The family called the police, who came and checked on Eason.

Eason and his fiancee finally left his sister's house and returned to his fiancee's residence. There, he began to make crosses on her forehead with his fingers. He then began to use the crosses that he had bought at the pawn shop to make cross marks on her forehead. When she started to bleed, she called the police, who watched over her as she left with her baby to walk to her sister's house. He told police that he had been popping bumps on her face.

The following day, Jeanette Singleton, the mother of Eason's two children, accompanied Eason and the children to Springfield to visit Eason's mother. After leaving Springfield, Eason took Ms. Singleton and the children to his parents' home in Bloomingdale. When Eason's brother called the house looking for his wife, he spoke with Ms. Singleton. In the middle of their conversation, Eason took the telephone,

---

[1] The crime was committed on January 27, 1985. The Chatham County jury returned its verdict of guilty on January 10, 1986. A motion for new trial was filed January 14, 1986, and amended on February 20, 1986. The motion for new trial was overruled on June 12, 1986 and notice of appeal was filed in this Court on June 23, 1986. The transcript of evidence was filed July 10, 1986 and the record was docketed in this Court on July 17, 1986. The case was submitted on August 29, 1986.

told his brother, "This is the house of the Lord," and hung up the telephone.

Eason's brother thought at that time that his daughter was with Eason in the house, so he drove out to the house to make sure Eason did not harm anyone. When he arrived, he saw that Ms. Singleton and the children were crying. Eason asked him to leave them alone. The brother left and shortly thereafter asked a Bloomingdale policeman, Vick Burke, to stop by the Eason house to check on Ms. Singleton and the children.

The policeman talked Eason into allowing Ms. Singleton to drive the children back into Savannah. Eason did not appear to the policeman to be violent at the time, so after Eason described to the officer the religious symbolism of various objects and writings scattered across the floor, the officer left. When Officer Burke's replacement, Officer Anderson, stopped by the Eason's home later that evening to monitor the situation, he found the house dark and empty. He noticed that someone had placed the portable television on top of the wood stove and burned it. He followed footprints from the Eason home to the home of Frank Moody, Eason's long-time friend.

Eason had, in fact, walked over to Mr. Moody's house at some point after burning the television and his clothes. In spite of Eason's nudity, Mr. Moody let him inside his house. Eason went to bed in the guest bedroom that Moody prepared for him.

While in bed, Eason heard a noise that began like Moody's snores, but turned into demon voices. He got out of bed when he saw Moody walking toward the television in the den. At that point, Eason testified, Moody appeared to change into a demon, so Eason shot and killed Moody with a shotgun. After the shooting, Eason went to sleep in the guest bedroom.

The next morning, Eason walked back to his parents' house. After talking to another policeman who came by to check on him, Eason walked back over to Moody's house. Cleveland Best saw Eason, clad only in shorts, walk into the house. When Eason came back out of the house, he was naked, holding a shotgun and a Bible.

Eason walked over to Best and asked him whether he was an angel or a satan. Best replied that he was an angel. Eason said that Best was lying and that Best was a satan. He then fired three shots at Best as Best ran to a nearby home.

Ralph Scott was making his bed that morning when Best burst into his house, shouting that some man had tried to shoot him. Almost immediately, Scott heard his mother say, "Oh my God, he shot Leroy." Eason had shot Leroy Kelley twice.

When Kelley crawled into a field, attempting to escape, Eason followed him, and according to Scott, told Kelley, "Leroy, I hate your guts." He then shot Kelley again, killing him. When the police then

arrived, Eason ran back into his parents' house. Eason testified at trial that Kelley had appeared to be a demon.

When the police asked Eason to come out of the house, he said, "No, you come in." Eason finally came out of the house, still naked, and dropped his gun. The officer who took Eason into custody testified at trial that Eason "just started rattling on about Jesus Christ and satan, this, that and the other." The police then took Eason to the hospital rather than to the jail, because of Eason's bizarre rantings.

The doctor who examined Eason at the hospital testified that Eason, on arrival at the hospital, was "out of contact with reality." He also testified that at that time, he diagnosed Eason as psychotic. On cross-examination, the doctor stated that he was not a psychiatrist.

The policeman who guarded Eason at the hospital testified that Eason was restrained on a guerney while in the hospital. Eason was also naked while in the hospital. The policeman testified that Eason did not appear to be cogent or rational during the two and a half hours that he spent in the hospital.

Two psychiatrists testified at trial. One stated that in his opinion, Eason was suffering from an acute psychotic break, or delusional compulsion, at the time that he killed the two men. He also stated that in his opinion, Eason could not tell the difference between right and wrong at the time of the killings, and that Eason was not a malingerer.

The other psychiatrist testified that in his opinion, an acute psychotic break had overpowered Eason's will at the time of the killings. He also testified that Eason could not tell the difference between right and wrong at the time of the killings and that Eason was not a malingerer. On cross-examination, the psychiatrist testified that people suffering from acute psychotic breaks may be able to tell the difference between right and wrong and may occasionally be aware of the nature and quality of their acts.

1. Eason contends that he overcame, by a preponderance of the evidence, the legal presumption that he was sane at the time that he killed Kelley and Moody.

Summarized, the following evidence tends to support Eason's contention.

(a) Frightened by Eason's bizarre behavior, Eason's family called the police to handle Eason at least three times in the two days preceding the killings.

(b) The local police, in fact, checked on Eason a number of times during that period, once leaving when Eason agreed to be hospitalized.

(c) Eason burned his television and his clothes, and then walked, naked, on a January night, over to a friend's house, where he burned

another television.

(d) He shot his friend, thinking that the friend was a demon, then he went to sleep.

(e) The next morning, he went home, where he talked to a policeman. After the conversation, he returned to his dead friend's house, on a January morning, clad only in his underwear.

(f) He retrieved a Bible and a shotgun from the house, left the house naked, and fired the gun at a teenaged boy after calling the boy a satan. He then killed another old family friend, claiming that he, too, was a demon.

(g) Two psychiatrists testified that Eason suffered from an acute psychotic break that overmastered his will at the time of the killings, causing the violence.

(h) Both psychiatrists testified that Eason was not a malingerer.

(i) The doctor who examined Eason at the hospital where the police took Eason immediately after the killings diagnosed Eason as psychotic.

(j) The policeman who guarded Eason at the hospital testified that at that time, Eason did not appear to be cogent or rational.

In addition to the evidentiary presumption of the defendant's sanity, the following evidence tends to support the state's contention.

(a) A neighbor testified that Eason expressed hatred towards one of the victims immediately before killing him.

(b) One policeman testified that Eason seemed in control of his faculties in the morning on the day of the second killing.

(c) Eason attempted to give a rational explanation for scratching his fiancee's face.

(d) One psychiatrist testified that Eason's comment toward Kelley could indicate either anger or a psychotic break.

(e) Eason, when he saw the police, ran into his parents' house after he shot Kelley, and only came out when threatened.

(f) No doctor detected a cause for the psychotic break.

In reviewing a verdict of guilty but mentally ill in a case where the appellant relies on OCGA § 16-3-3, this court determines whether, construing the evidence in favor of the verdict, a rational trier of fact could have concluded that the appellant failed to show by a preponderance of the evidence that his will was overmastered by a delusional compulsion which caused him to commit the act or acts that led to his indictment, trial, and conviction. *Keener v. State*, 254 Ga. 699 (334 SE2d 175) (1985). This court concludes, under the foregoing evidence, that a rational trier of fact could have concluded that a preponderance of the evidence did not show that the killing of Frank Moody and Leroy Kelley occurred as a result of a delusional compulsion that overmastered Eason's will. Compare *Stevens v. State*, 256 Ga. 440 (350 SE2d 21) (1986).

2. Implicit in the foregoing analysis is the conclusion that the state adequately proved the element of intent at trial.

3. We do not find the photographs subject to the appellant's attack to be inadmissible. *Brown v. State,* 250 Ga. 862 (302 SE2d 347) (1983).

*Judgment affirmed. All the Justices concur, except Smith and Bell, JJ., who dissent.*

GREGORY, Justice, concurring.

I concur in the Per Curiam opinion and write to comment on the subject of sufficiency of the evidence of sanity in light of the guilty but mentally ill statute. OCGA § 17-7-131. Prior to the guilty but mentally ill statute a jury was faced with a choice between two states of mind, sane and insane. Assume these two mental states are placed on a continuum from zero to 100 with sanity concentrated at zero and ever so gradually transforming into insanity someplace along the continuum toward 100 where insanity is concentrated. There is no clear demarcation between the two, only degrees of each up and down the scale. A factfinder's choice in any case above zero and below 100 is hard to refute. A reviewing court had to determine if a guilty verdict was supported by the evidence under the appropriate standard of review. This was often a difficult task but at least there were only two choices in this scheme of things. Now the statute has inserted on the continuum between sane and insane the category of mentally ill. Perhaps that is concentrated at about 75 on our scale. Where a jury has found the defendant mentally ill, but the defendant contends he was insane, a reviewing court has an even more difficult task because the separation between mentally ill and insane is less. A reviewing court is not as likely to overturn a verdict where the choice was between two categories more nearly aligned. We are faced with this latter choice in this case. As a juror I might have voted to find the defendant insane. But I am unwilling to overturn this fact issue under our standard of review. *Brown v. State,* 250 Ga. 66, 71 (295 SE2d 727) (1982).

HUNT, Justice, concurring.

I write separately to address Justice Gregory's analysis of the gradations of mental responsibility for criminal conduct and to disagree with his premise, as well as to comment on Justice Smith's dissent.

Legally speaking, guilty but mentally ill is not some vague middle ground between sanity and insanity. Instead, that verdict is necessarily predicated upon a finding by the jury that the defendant is legally sane, that is, that at the time of the commission of the crime he knew right from wrong and was not laboring under a delusional compulsion. Once the jury rejects the defendant's contention that he is

legally insane, it may nonetheless modify the guilty verdict with "but mentally ill." On review of such a verdict, the only question before the appellate court is whether "a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the crime." *Brown v. State*, 250 Ga. 66, 71-72 (295 SE2d 727) (1982). This is, of course, the same standard of review where the verdict is simply "guilty."

Contrary to Justice Smith's contentions, I find this case distinguishable from *Stevens v. State*, 256 Ga. 440 (350 SE2d 21) (1986). In *Stevens*, the trial court, after a bench trial, found in a written order that the defendant was laboring under a delusional compulsion which overmastered his will and which caused the criminal act. Its finding on the third element of delusional compulsion that the delusion, if true, would not have justified the act, and his resulting judgment of guilty but mentally ill were reversed by us because we found that the evidence demanded a contrary finding on that third prong in light of the trial court's other findings. Here, Eason was convicted by a jury which made no such conflicting findings. Thus, its verdict of guilty but mentally ill must be affirmed since the contrary, not guilty by reason of insanity, is not required under the evidence.

In conclusion, while a guilty but mentally ill verdict may be said to add credence to the defendant's contentions concerning his mental state, it is nonetheless a legal rejection of his insanity plea. We cannot say from the evidence in this case that rational jurors could not find that the defendant failed to prove insanity by a preponderance of the evidence. *Brown v. State*, supra.

SMITH, Justice, dissenting.

1. Certainly, compare *Stevens v. State*, 256 Ga. 440 (350 SE2d 21) (1986). Two men, possessed with uncommon religious fervor, kill people to whom they are closely related by friendship or marriage. Of the two, the record reveals Stevens to have been far more lucid than Eason in the time period surrounding their respective acts of violence.

The police picked up Stevens more than a full day after he had killed his wife, after he had associated peacefully with a number of people. Stevens at the time was fully clothed, and possessed the ability to communicate lucid, though strange, thoughts to others. The police took him to the station rather than to the hospital.

Police, answering at least the fourth call about Eason during the week of his violent behavior, found that Eason had spent the previous twenty-four hours burning televisions and clothing, walking nude around Bloomingdale while carrying a shotgun and a Bible, and firing the shotgun at friends and strangers. At the time that the police picked Eason up, he was "babbling" about Satan and religion. The police took Eason directly to the hospital where he was strapped to a

guerney, still naked, and diagnosed by the admitting physician as acutely psychotic.

Both Eason and Stevens took actions or made statements that could be construed as signifying a capacity to distinguish between right and wrong. Stevens asked about the death penalty, attempted to wipe blood from the scene, and stated that he would be a murderer if his wife did not rise from the dead as planned. His statements and actions related directly to the crime for which he was charged. This court recognized, however, that this evidence could only be employed logically to refute a defense of lack of capacity and did not relate at all to the "delusional compulsion" defense found at OCGA § 16-3-3.

Eason told police that in scratching his fiancee's face with a cross, he was attempting to pop bumps on her face. He also ran into his parents' house after killing Kelley. Here, in spite of the fact that both of these items of evidence relate only to a defense of lack of capacity, and one involves an incident other than the crime for which Eason was charged, the court has reversed itself and now cites the evidence in support of the jury verdict. Perhaps there are standards of review at work, here, which override the law of relevance and render irrelevant any notions of consistency.

*No evidence*, save the presumption of sanity, tends to show that Eason killed Moody as a result of anything other than a delusional compulsion brought on by the mental illness found by the jury. Only one bit of evidence other than the irrelevant evidence cited above and the purely ambiguous "evidence" found in Items (d) and (f) of the evidence cited in support of the jury verdict could be rationally cited as evidence that Eason killed Kelley as a result of anything other than a delusional compulsion brought on by his mental illness. That bit of evidence consists of the testimony of a person who was within "hollerin'" distance, who claimed to have heard Eason tell Kelley that he hated Kelley before he fired the final shot into Kelley.

2. Stack up the presumption of sanity and the one piece of competent evidence that Eason killed Kelley as a result of anything other than a delusional compulsion, keeping in mind the absence of evidence that Eason killed Moody as a result of something other than a delusional compulsion. Stack up the evidence that Eason was religiously obsessed to the point of burning dolls, selling his truck to raise money to buy crosses which he could use to scratch his fiancee's face, speaking often of the arrival of paradise on the weekend of the killings, and strolling naked in January, shotgun and Bible in hand. Add to the second stack the testimony of two psychiatrists, the doctor who admitted Eason to the hospital on the night of the second murder, and at least one policeman, that Eason's delusions totally controlled him. Do not even go into the many, many other small items of evidence in the record pointing to the fact that Eason was full-blown

crazy.

Compare the first stack of evidence with the second. Conclude that someone could rationally find the first stack a more accurate indicator of the forces driving Eason to act, or, in legal terminology, a preponderance of the evidence. You have performed a resurrection, the very feat which eluded Mr. Stevens. You have breathed life back into the "any evidence rule"; the rule this court allegedly killed in *Brown v. State*, 250 Ga. 66, 71 (295 SE2d 727) (1982).

3. The addition to the Official Georgia Code of the guilty but mentally ill statute, OCGA § 17-7-131, did not change our standard of review from that found in *Brown*, supra, and it did not affect or alter the definition of the "delusional compulsion" defense. The majority opinion, by implication, and Justice Gregory's concurrence on its face, act as though OCGA § 17-7-131 gives a jury a third option as to degree of culpability on the part of a defendant. While such a distorted perception of the effect of the adoption of OCGA § 17-7-131 on the part of a jury may be troublesome, that perception on behalf of this court, the body created by the people to protect the rights of even the crazy individual, amounts to a slap at the constitution.

a) Mental illness has *always* been an element of the delusional compulsion defense. The defendant has *always* had to prove mental illness as a prerequisite to a successful showing of insanity under OCGA § 16-3-3. Justice Gregory's concurrence misses the mark in implying that a finding of mental illness is anything new in a trial involving OCGA § 16-3-3. Once a jury finds mental illness, as the jury in this case did, the question then becomes whether the mental illness caused a delusion which overmastered the defendant's will, compelling him to commit the crime for which he was charged. A reviewing court, thus, has to determine the same exact thing that it considered back in 1982, before the passage of the guilty but mentally ill statute.

b) The addition of "guilty but mentally ill" to the list of possible verdicts, as well, has absolutely no effect on the jury's determination of the culpability of the defendant or on the amount of time to which a defendant is sentenced, a fact which might surprise many jurors. A verdict of guilty of murder but mentally ill still brings a defendant a sentence of life imprisonment. Such a verdict is tantamount to a finding of "guilty but with a serious heart problem." The additional verbiage may explain why the defendant robbed a store to raise money for his bypass operation, and it may entitle the defendant to adequate medical care, but he will not complete his sentence one day earlier than he would under a simple sentence of guilty. His guilt, as a legal matter, is not mitigated one whit.

"Guilty but mentally ill" may now be a third choice of words that a jury may choose in a case such as this case. That verdict, however, still means guilty, and only carries with it the promise of psychiatric

care, which becomes particularly important in a case such as this one in which a crazy man faces a future of life in prison. To use the new verdict as an excuse to change the standard of review in cases such as this, to change the definition of an unaltered statute, or to brand a man a murderer where the law and facts clearly indicate that the man was not sane amounts to an amendment of the statutes and the constitution of this state by this court in the name of expediency. Perhaps one reversal of a conviction of an insane killer is all this court can handle in one term. Compare *Stevens v. State*, supra.

DECIDED FEBRUARY 26, 1987.

*Robert Blevins Royce*, for appellant.
*Spencer Lawton, Jr.*, District Attorney, *Barry I. Mortge*, Assistant District Attorney, *Michael J. Bowers*, Attorney General, *Dennis R. Dunn*, Assistant Attorney General, for appellee.