S94A1756. LAWRENCE v. THE STATE.
(454 SE2d 446)

HUNSTEIN, Justice.

Stephen James Lawrence was found guilty but mentally ill of felony murder, four counts of aggravated assault, and possession of a firearm during the commission of crimes. He appeals from the denial of his motion for a new trial.[1]

1. The evidence was uncontroverted that appellant killed Elizabeth Van Alstine and seriously injured four others with a shotgun. The sole issue before the jury was whether appellant was guilty but mentally ill or not guilty by reason of insanity pursuant to OCGA § 16-3-3 (delusional compulsion).

The evidence at trial established that appellant had been diagnosed as having atypical psychosis with delusions in 1984, and chronic forms of schizophrenia in 1987, 1988, and 1990. In 1988 he shot and wounded his mother under the delusion that the medication she was administering to him contained poison. At the time of the crimes, appellant was receiving a low dosage of the antipsychotic drug Haldol, which was given in monthly injections at the Community Mental Health Center (CMHC) in Richmond County. On the morning of the day he had an appointment to receive an injection, appellant drove to his father's home (a one and one-half-hour drive) and took his father's shotgun and 15 to 20 buckshot shells (leaving behind the birdshot). He then drove to the CMHC and began firing at random at people and vehicles in the parking lot and shot out the car windshield of a psychiatric nurse who was driving through the parking lot. He shot the first three people who unsuspectingly exited the main building at the CMHC, fatally wounding Van Alstine. Appellant entered

---

[1] The crimes occurred on October 8, 1991. Lawrence was indicted April 14, 1992 in Richmond County. He was found guilty but mentally ill on October 22, 1992 and was sentenced that day to life imprisonment for the felony murder, twenty years each on the four aggravated assault counts, and five years on the possession count, all sentences to run consecutively. His motion for new trial, filed November 23, 1992 and amended June 21, 1993, was denied June 30, 1994. A notice of appeal was filed July 7, 1994. The appeal was docketed August 11, 1994 and was orally argued November 7, 1994.

the main building by shooting out the glass in the front door; fired on one person sitting just inside the door and another as he fled down the hallway; continued to fire the shotgun as police arrived at the front door; and ceased his assault minutes before the police converged on him. A CMHC counselor who talked with appellant before the police arrived testified that appellant spoke coherently, gave his correct name,[2] knew where he was, and told CMHC personnel to contact the police. With the exception of the psychiatric nurse in the parking lot, none of the other victims had ever been involved in any manner in the administration of the injections to appellant. From the evidence as to the sequence and timing of the crimes, the jury was authorized to conclude that appellant did not attempt to ascertain the identity of his victims before he assaulted them.

The forensic psychologist appointed by the court testified that appellant had the capacity to distinguish right and wrong but was suffering from a delusional compulsion which he could not resist. The psychologist also testified that "there was no doubt that [appellant] knew what he did was wrong" when he hurt and killed the people at the CMHC.

The defense presented witnesses who testified that appellant was suffering under an extremely complex delusion, the relevant content of which was that hostile Canadian spies and saboteurs had entered the United States and that many of them had infiltrated the CMHC and were intent on poisoning him, by means of the monthly injections, because they recognized that he was actually John F. Kennedy. In his testimony, appellant gave these delusional beliefs as facts. The defense expert witness testified that at the time of the crimes, appellant was compelled under his delusion to take actions appellant believed were in self-defense. Appellant testified that the people at the CMHC were trying to brainwash him or damage his brain and that he felt at the time of the crimes that his actions were justified, but acknowledged he no longer felt that way because "some innocent people got hurt."

> The appropriate standard of appellate review . . . is whether the evidence, when construed most favorably for the State, would be sufficient to authorize a rational trier of fact to find that appellant failed to prove by a preponderance of the evidence that [he] was insane at the time of the [crimes.] [Cit.]

*Foote v. State*, 265 Ga. 58 (1) (455 SE2d 579) (1995). See also *Brown*

---

[2] The police officer who took appellant into custody testified that appellant identified himself as "King David of Canada."

*v. State*, 250 Ga. 66 (295 SE2d 727) (1982). This Court concludes, under the foregoing evidence, that a rational trier of fact could have concluded that a preponderance of the evidence did not show that the criminal acts committed by appellant occurred as a result of a delusional compulsion that overmastered appellant's will, were connected with the delusion he was laboring under, and were justified by the delusion. *Eason v. State*, 256 Ga. 701, 704 (1) (353 SE2d 188) (1987); *Brown v. State*, 228 Ga. 215 (2) (184 SE2d 655) (1971). Compare *Stevens v. State*, 256 Ga. 440 (350 SE2d 21) (1986).

Moreover, having reviewed the evidence in the light most favorable to the jury's verdict, we find that a rational trier of fact could have found beyond a reasonable doubt that the appellant was guilty but mentally ill. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also *Hill v. State*, 259 Ga. 341 (1) (381 SE2d 41) (1989); *Caldwell v. State*, 257 Ga. 10, 11 (1) (354 SE2d 124) (1987).

2. Appellant contends the trial court violated his due process and equal protection rights by charging the jury that in order for mental delusion to constitute a defense to the acts charged, it had to appear not only that the accused was actually laboring under a delusion at the time the acts were committed

> but that the alleged criminal acts themselves were connected with the particular delusion under which the accused was then laboring, *and that the delusion was as to a fact which, if true, would have justified the alleged acts by the accused.*

(Emphasis supplied.) See Suggested Pattern Jury Instructions, Vol. II, Criminal Cases (2d ed.) Part 3 (EE) (3) (Delusional Insanity). This charge reflects the requirements for a delusional compulsion insanity defense recognized by Georgia case law since 1898. *Taylor v. State*, 105 Ga. 746 (1) (31 SE 764) (1898). See, e.g., *Stevens v. State*, supra at 442; *Bailey v. State*, 249 Ga. 535, 537 (291 SE2d 704) (1982); *Brown v. State*, 228 Ga., supra at 217.

Appellant argues that the "justification" language in the charge unconstitutionally differentiates between those defendants who are subject to a delusion that justifies a criminal act and those defendants, like appellant, who are subject to a delusion that does not justify a criminal act, notwithstanding that both types of defendants are powerless to resist their respective delusional compulsions.

Legal insanity is not established by a medical diagnosis that an individual suffers from a mental illness such as a psychosis. *Nelms v. State*, 255 Ga. 473, 475 (340 SE2d 1) (1986); *Dennis v. State*, 170 Ga. App. 630 (2) (317 SE2d 874) (1984). Under Georgia law, insanity is established when an individual proves, by a preponderance of evi-

dence, that at the time the criminal act was committed, he "did not have mental capacity to distinguish between right and wrong" in relation to the criminal act. OCGA § 16-3-2. See also *Brown v. State*, 250 Ga., supra at 71-72 (2) (c). However, an individual can establish insanity, even where he possesses the ability to distinguish right and wrong, when he proves by a preponderance of evidence that at the time the criminal act was committed, he suffered from a "delusional compulsion as to such act which overmastered his will to resist committing the crime." OCGA § 16-3-3. It is only in those instances where an individual, who is able to distinguish right from wrong, commits a criminal act while suffering under a delusional compulsion which leads him to believe his action is *right*, i.e., "justified," that Georgia law accepts insanity as a defense. Hence, "if the delusion is as to a fact which would not excuse the act with which the prisoner is charged, the delusion does not authorize an acquittal of the defendant." *Mars v. State*, 163 Ga. 43, 60 (4) (135 SE 410) (1926).

In *Hicks v. State*, 256 Ga. 715, 726 (16) (c) (352 SE2d 762) (1987), an appellant unable to assert either OCGA § 16-3-2 or § 16-3-3 challenged Georgia's failure to recognize an impulse-control-disorder insanity defense. Relying on federal authority that " 'society must be protected from individuals who may be unable to conform their conduct to the law. . . .' [cit.]," *Hicks*, supra at 726-727, this Court upheld the constitutionality of Georgia insanity laws. *Hicks* thus stands for the position that a defendant who can distinguish between right and wrong and who commits a criminal act he recognizes is *wrong* but which he is compelled to commit by an uncontrollable impulse or compulsion, has no insanity defense under Georgia law. Similarly, we find in the case at bar that society must be protected from individuals who can distinguish between right and wrong but who cannot conform their conduct to the law because they suffer from delusional compulsions which compel them to commit criminal acts which are not justified by the delusions under which they suffer.

The "justification" requirement reflects a decision to allow the insanity defense only in those instances where the factfinder concludes from a preponderance of evidence that the defendant, although suffering under delusions of an absurd and unfounded nature, was compelled by that delusion to act in a manner that would have been lawful and right if the facts had been as the defendant imagined them to be.[3] Georgia constitutionally could decline to recognize an insanity

---

[3] We acknowledge that although other states have a comparable requirement, see, e.g., *Conaway v. State*, 663 SW2d 53, 55 (Tex. App. 1983); *Dukes v. State*, 499 P2d 471, 476 (Okla. Cr. App. 1972), other states have criticized the justification requirement. See, e.g., *Ryan v. People*, 153 P 756 (Colo. 1915); *State v. Keerl*, 75 P 362 (Mont. 1904). For a general discussion of the topic, see 21 AmJur2d 169, Criminal Law, § 51.

defense based on any type of irresistible impulse. *Leland v. Oregon,* 343 U. S. 790, 800-801 (72 SC 1002, 96 LE 1302) (1952). Accordingly, we conclude that among the group of similarly situated individuals, namely, mentally ill defendants who are capable of distinguishing between right and wrong, it is not unconstitutional to differentiate between defendants who are compelled to act in a manner "justified" by their delusions and defendants, like appellant, who act, however compelled, in a manner they are capable of recognizing as wrong. Accord *Hicks,* supra. Therefore, the trial court did not err by including the justification requirement in its delusional compulsion charge.

3. Appellant contends the trial court erred by denying his motion to either suspend the involuntary administration of the antipsychotic drug, Haldol, or to lower the dosage to the amount appellant was using at the time of the crimes.[4]

(a) Under *Riggins v. Nevada,* 504 U. S. ____ (112 SC 1810, 118 LE2d 479) (1992), a state satisfies due process if it is demonstrated by the prosecution and found by the trial court

> that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the accused's] own safety or the safety of others. [Cits.]

Id. at 1815.

Appellant concedes the propriety of the medical treatment. As to alternatives, the State's expert witness testified at length about other antipsychotic drugs available and related appellant's earlier-stated preference for Haldol and lack of complaint regarding side effects from it.[5] The expert also testified that while a higher dosage of Haldol might eliminate appellant's delusions, the "average" dosage appellant was receiving at the time of the hearing allowed appellant to retain his delusional beliefs but just prevented him from feeling that he had to act out the delusion. The expert also testified that reducing appellant's dosage of Haldol would quickly impair his ability to assist in his defense and would bring about a return of the more severe symptoms of his illness. In this regard, the expert testified how a lower dosage would adversely impact appellant's well-being, in that each and every time appellant has a psychotic episode, his ability to return to his previous level of functioning is reduced, even when returned to higher

---

[4] Appellant was receiving 100 mg. of Haldol every three weeks at the time of trial. At the time the criminal acts were committed, he was receiving 25 mg. of Haldol every month.

[5] Other than some restlessness which the expert witness testified could also be attributed to nervousness, the record fails to reflect that appellant demonstrated any side effects from the medication that could be discerned by a jury.

medication levels. In addition to this evidence about the need to maintain the current level of medication for appellant's own health and well-being, the expert testified that at his current level appellant was "perfectly safe" and discussed the unpredictability of appellant's violent behavior should the dosage be lowered.

Based on this and other testimony set forth in the transcript of the hearing conducted on appellant's motion, we find that the State presented sufficient evidence to support the trial court's ruling that appellant's medication should not be suspended or reduced during trial. Accord *State v. Baker*, 511 NW2d 757, 760-761 (Neb. 1994).

(b) Appellant also asserts that denial of his request to be returned to the lower dosage he was on at the time of the crimes was unconstitutional because it prevented the jury from observing his state of mind and/or demeanor as it existed at the time of the crimes.[6] The U. S. Supreme Court in *Riggins* declined to rule upon the claim that administration of an antipsychotic drug denies a defendant "an opportunity to show jurors his true mental condition," because the issue was not properly presented. Id. at 1814 (II). Likewise, this Court deemed it unnecessary to reach the issue when it was presented in *Norris v. State*, 250 Ga. 38 (4) (295 SE2d 321) (1982).

Other jurisdictions that have addressed the subject of the medication of defendants during trial have recognized that the issue involves consideration of matters such as the necessity of medication to enable a defendant to assist counsel at trial, the state's interest in bringing an accused to trial, an accused's interest in being free from mind-altering drugs, and the weight jurors give to the courtroom demeanor of accuseds who assert an insanity defense. See, e.g., *State v. Lover*, 707 P2d 1351 (Wash. App. 1985); *In re Pray*, 336 A2d 174 (Vt. 1975); *State v. Maryott*, 492 P2d 239 (Wash. App. 1971). See generally 3 Perlin Mental Disability Law Civil & Criminal, § 14.09.

We find merit in the argument that the State's compliance with the requirements in *Riggins* fails to address adequately an accused's interest in the impact his medicated demeanor may have upon the jury's evaluation of his sanity. An accused's

> deportment, demeanor, and day-to-day behavior during [his] trial, before [the jury's] eyes, [is] a part of the basis of their judgment with respect to the kind of person he really was [at the time of the crime], and the justifiability of his defense of insanity.

---

[6] We acknowledge the trial court's observation of the near impossibility of any defendant (mentally ill, intoxicated, emotionally provoked, or otherwise) ever reenacting or recreating for a jury the precise mental or emotional state that existed at the time of any crime.

*In re Pray*, supra, 336 A2d at 177. See also *Maryott*, supra, 492 P2d at 242. Georgia law has long recognized the critical role a party's demeanor and appearance plays in a jury's consideration of a case. See, e.g., *Christenson v. State*, 261 Ga. 80, 89 (7) (b) (402 SE2d 41) (1991); *Norris v. State*, supra at 43 (3); *Reynolds v. Reynolds*, 217 Ga. 234, 249 (3) (123 SE2d 115) (1961), overruled on other grounds, *Scherer v. Scherer*, 249 Ga. 635, 640 (2) (292 SE2d 662) (1982); *Mustang Transp. v. W. W. Lowe & Sons*, 123 Ga. App. 350, 352 (3) (181 SE2d 85) (1971); *Reed v. State*, 110 Ga. App. 305 (138 SE2d 466) (1964).

We recognize that the demeanor at trial of a criminal defendant is of probative value with respect to the defense of insanity.

> A [criminal] sentence ought not to rest on the shaky premise that an undisclosed behavioral alteration, brought about by the State, did not affect the jury's resolution of the issue of insanity.

*Pray*, supra. Although a defendant is not entitled to have the jury view him or her in an unaltered, undrugged state in those instances where the requirements of *Riggins* are met, we hold henceforth that a defendant, who is under medication that may affect his demeanor, is entitled, upon the motion of defense counsel, to have the jury informed by the court at the beginning of the trial and in the charge to the jury that the defendant is under the influence of medication, that the defendant's behavior in their presence is conditioned by the medication, and that the insanity asserted as defendant's defense is to be evaluated as of the time the alleged criminal acts were committed.[7] This holding applies to those trials conducted from the date this opinion is published in the advance sheets, June 15, 1995.

In the case at bar, the jury was made aware of the change in appellant's behavior as a result of his medication through statements by defense counsel, testimony by appellant's mother and the defense expert witness, and by appellant's own testimony, in which he acknowledged he was taking more Haldol than he had ever before taken and testified in detail as to the effect the medication was having on him. Hence, the jury's evaluation of appellant's insanity defense did not rest on an "undisclosed behavioral alteration," *Pray*, supra, but was the result of an informed consideration of appellant's altered behav-

---

[7] See Florida Rules of Criminal Procedure, Rule 3.2145 (c) (2), Effect of Adjudication of Incompetency to Proceed: Psychotropic Medication, which provides

If the defendant proceeds to trial with the aid of medication for a mental or emotional condition, upon the motion of defense counsel, the jury shall, at the beginning of the trial and in the charge to the jury, be given explanatory instructions regarding such medication.

*In re Amendments to Fla. Rules of Criminal Procedure*, 536 S2d 992, 1002 (Fla. 1988).

ior. Accordingly, appellant's enumeration presents no reversible error. See *Norris, supra* at (4).

*Judgment affirmed. All the Justices concur, except Hunt, C. J., and Carley, J., who concur in Divisions 1, 2, 3 (a) and in the judgment.*

DECIDED FEBRUARY 27, 1995 —
RECONSIDERATION DENIED MARCH 30, 1995.

*Michael C. Garrett,* for appellant.

*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Marla-Deen Brooks, Assistant Attorney General,* for appellee.