## A01A1048. JACKSON v. THE STATE.
(554 SE2d 592)

SMITH, Presiding Judge.

Johnnie Jackson was convicted by a jury of five counts of aggravated assault and two counts of aggravated battery. He filed a motion for new trial, which was denied. His sole contention on appeal is that evidence presented by him that he suffered from a delusional compulsion required verdicts of not guilty by reason of insanity. Because we conclude that Jackson did not meet his burden of showing by a preponderance of the evidence that he was insane at the time of the incident, we do not agree, and we affirm.

The events that resulted in the charges against Jackson occurred during a family gathering at the home of two of the victims. Those victims, a husband and wife, were Jackson's next-door neighbors. The husband's teenage children and some of their friends were present at the home. Jackson picked up a bush and threw it onto the victims' driveway. The husband then picked it up and threw it back into Jackson's yard, telling Jackson to leave them alone. The husband testified he did not threaten Jackson when he threw the bush back but did tell him, "I'm tired of you messing with my d— family."

Immediately after the husband threw the bush, Jackson ran from his garage, aiming and firing a gun at the individuals gathered outside the victims' home. He shot the wife in each arm and her head, and he shot the husband in his arm and back while the husband tried to help his wife. Four other individuals standing outside ran in fear for their lives. The gun was fired into the house as well, causing damage to furniture, walls, and other portions of the interior of the house. The incident was captured on videotape by a surveillance camera the victims had previously installed, and the tape was played to the jury.

Jackson's version of the incident differed from that of the victims. He testified that while he was outside washing his car, some people were in the victims' driveway, and one of them "kept coming outside looking in his trunk, digging through his trunk. And they were looking over at me, giving me dirty looks and he'd slam his trunk." He testified that the wife walked onto her deck, "and she was waving a gun" and screaming something he could not hear because of the loud music playing outside. He stated that he became angry and scared and sent his wife and children into the house. Jackson stated he did not "have a clear memory" of the events that occurred after

that time. He claimed that he did not remember throwing the bush and that the only thing he remembered was seeing the "plant come down" and the husband coming down onto his property. Jackson felt that his life was in danger.

On cross-examination, Jackson stated that the shooting happened quickly and admitted that he fired 15 shots. He agreed that there was no doubt in his mind that he "knew he had done something wrong." He admitted shooting his gun and running toward the crosstie wall on which he claimed the husband was standing. And although he stated on direct examination that he did not remember throwing the bush, on cross-examination, when asked why he pulled up the bush and threw it at the victims, he answered, "After she come out there waving that gun through the back of her house, it kind of made me angry."

After the shooting, Jackson went inside his home. Law enforcement personnel arrived, and he was ordered outside. The arresting officer testified that Jackson followed his instructions concerning his commands to come out of the house, lie facedown on the ground, and keep his hands in plain view. Jackson was then handcuffed. The officer testified that Jackson was not injured and that he appeared to understand his *Miranda* rights after they were read to him. In response to the officer's questions regarding the location of the gun, Jackson stated that it was in a closet inside the house. The officers used this information to search for the gun and indeed discovered it inside a closet on a shelf.

A few hours later, Sergeant Bruce Ferguson interviewed Jackson at the jail. He testified that Jackson was coherent and appeared to understand his *Miranda* rights. Ferguson stated that Jackson was not doing anything that Ferguson considered to be irrational or inappropriate. He responded appropriately to Ferguson's questions and followed his instructions. Jackson told Ferguson that he had experienced problems over the past two and a half years with the victims, who had threatened to kill him, and he believed the husband was jealous of him. Jackson told him he was washing his vehicle, and the victims "had some company over and they were laughing [and] staring at him. And [the husband] went and pulled up a bush and threw it in his driveway. And then I asked him what happened then and he said . . . he just got tired of it."

The shooting was the culmination of longstanding difficulties between Jackson and the victims, which began when Jackson began complaining to the victims concerning water run-off onto his property that occurred when the victims watered their lawn. According to the wife, Jackson harassed her, broke their sprinkler, threw trash in their yard, cut their trees, "egged" their house, and threatened to kill her. She testified that Jackson was controlling and bossy and she felt

intimidated by him. The sheriff's department was summoned a number of times both by the victims and by Jackson concerning their many confrontations. Jackson was charged with a crime arising out of those confrontations but was tried and acquitted. The relationship between the victims and Jackson became even worse after that time.

Jackson testified as well concerning his relationship with the victims. He denied turning their water off, threatening them, or "egging" their house. He claimed that they "developed an attitude" regarding his requests for them to stop watering their lawn and that they harassed him concerning this issue. He believed that they watered their lawn on purpose to cause mud to run down his driveway. He testified that after the first trial, he often saw both the husband and wife carrying guns outside. According to Jackson, the victims wanted to "get rid of" him, because he had yelled at the wife and because the wife was coming onto his property and talking to him. He testified that they were "plotting and planning. They'd do things to aggravate me." Jackson stated that he believed his life was threatened and that his wife and children were in danger. He claimed to have heard voices from God telling him that the victims were going to kill him. Jackson stated that God had been revealing things to him as long as he could remember, testifying that "it seems like sometimes if I know something bad is going to happen, it usually does." We note that the husband and wife denied owning or possessing a gun in their home.

Both Jackson and the State presented expert testimony concerning Jackson's mental state at the time of the shooting. Dr. Dennis Herendeen, a licensed psychologist, diagnosed Jackson as having a paranoid personality disorder. Dr. Herendeen testified that at the time of the shooting, Jackson "had reached the point where his paranoia had taken over and he was totally out of control and was experiencing a brief psychotic episode." He believed Jackson was operating under the delusion that his neighbors were plotting to kill him and that the bush incident triggered Jackson's delusion that the neighbors "were starting to implement their plan." He testified that this delusion, if true, would have justified Jackson's acts. He agreed on cross-examination, however, that Jackson was the aggressor and provoked the shooting. He also testified that Jackson knew that the shooting was wrong and agreed that throwing the plant was not a legal justification for the shooting.

Although the State's experts testified that Jackson was paranoid, their opinions concerning Jackson's mental state at the time of the shooting differed from Dr. Herendeen's opinion. Dr. Robert Storms, a licensed psychologist, testified that Jackson was not psychotic and "was oriented to time, place, person, and situation, and that he knew what he was doing." Dr. Julie Rand, a psychiatrist, tes-

tified that Jackson had no major mental illness and clearly knew right from wrong at the time of the shooting. She further stated that when the shooting occurred, Jackson was not suffering from a "delusional compulsion . . . [n]ot to the degree, and especially to the degree that it would have justified the act."

Jackson argues that the jury was required to find him not guilty under OCGA § 16-3-3, which provides that an individual cannot be found guilty of a crime when, at the time of the crime, the individual, "because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime." A finding of insanity based on this Code section requires proof that the defendant acted under a delusional compulsion, that the crime was connected with the delusion, and that "the delusion related to a fact which, if true, would have justified the act. [Cit.]" *Appling v. State*, 222 Ga. App. 327, 329 (3) (474 SE2d 237) (1996). The standard of review "is whether the evidence, when construed most favorably for the State, would be sufficient to authorize a rational trier of fact to find that [the defendant] failed to prove by a preponderance of the evidence that he was insane at the time of the crimes." (Citations and punctuation omitted.) *Lawrence v. State*, 265 Ga. 310, 311 (454 SE2d 446) (1995). Unless the evidence of a defendant's insanity is overwhelming, a jury will not be bound by the opinions of expert witnesses regarding the defendant's sanity and may rely on the presumption of sanity set out in OCGA § 16-2-3. *Rodriguez v. State*, 271 Ga. 40, 42-43 (1) (518 SE2d 131) (1999).

Evidence was presented that Jackson suffered from paranoia as well as from delusions that the victims had threatened him for a long period of time and that his life was in imminent danger. But unlike the evidence of the defendant's insanity in *Stevens v. State*, 256 Ga. 440 (350 SE2d 21) (1986), relied on by Jackson, evidence of Jackson's alleged insanity was not overwhelming. In *Stevens*, the defendant had undergone psychiatric treatment periodically for over 20 years before he killed his wife, and the evidence was unrebutted that he was suffering from delusions at the time of the homicide. The evidence overwhelmingly showed that he had "met the justification criterion for a defense of delusional compulsion. [Cit.]" Id. at 442. Here, however, it is notable that Jackson did not present evidence that he had previously been diagnosed with psychiatric problems. And the State presented expert testimony that his delusion, if any, did not justify the crime of shooting at the husband and wife and their young guests.

Also, both the State and the defense presented evidence that Jackson knew what he was doing was wrong. In addition, the arresting officer testified that Jackson understood his commands, and

Jackson was able to direct the officers to the place where the gun was located. These facts were sufficient to authorize the jury to find that Jackson failed to prove by a preponderance of the evidence that he was insane at the time of the shooting. See *Foote v. State*, 265 Ga. 58, 59 (1) (455 SE2d 579) (1995) (jury authorized to reject insanity defense when State's witnesses testified defendant knew right from wrong and arresting officer testified that defendant appeared rational). See also *Lawrence*, supra at 311-312 (where appellant knew right from wrong, despite "extremely complex delusion," evidence sufficient to permit conclusion that appellant failed to show insanity). The evidence of Jackson's insanity in this case was not "undisputed and so overwhelming as to require reversal of the jury's decision. [Cit.]" *Appling*, supra at 329 (3).

*Judgment affirmed. Barnes and Phipps, JJ., concur.*

DECIDED SEPTEMBER 4, 2001.

*Monica T. Myles, Mary Erickson*, for appellant.
*David McDade, District Attorney, Brian K. Fortner, Assistant District Attorney*, for appellee.