311 Ga. 389
FINAL COPY

S21A0210.  THE STATE v. WALDEN.

PETERSON, Justice.

Carly Walden is charged with malice murder and other crimes for the April 28, 2019 shooting death of her mother, Andrea Walker, at Walker's home. On that date, Walden called police and reported a shooting; she claimed an unidentified man was responsible. Walden was transported to the county sheriff's office, where she made statements to an investigator before being provided warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966). On Walden's motion, the trial court suppressed those statements, while declining to suppress others that she had made earlier in the day. The State has appealed the trial court's ruling in advance of trial. When — as here — a trial court makes no explicit findings in ruling on a motion that does not require such findings to be made, we presume that the trial court implicitly made all the

findings in support of its ruling that the record would allow. But the record in this case does not allow the findings that would be necessary to conclude that Walden was in custody when she made the statements at issue, and so we reverse the trial court's suppression of Walden's statements.

"*Miranda* warnings must be administered to an accused who is in custody and subject to interrogation or its functional equivalent." *State v. Troutman*, 300 Ga. 616, 617 (1) (797 SE2d 72) (2017). This requirement arises "when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest." Id. Whether the circumstances in a particular case amount to custody is assessed objectively. "Thus, the proper inquiry is how a reasonable person in [Walden]'s shoes would have perceived [her] situation." Id. "In determining whether a suspect is in custody, we must consider the totality of the circumstances without regard for the subjective views of the suspect or the interrogating officer." *Licata v. State*, 305 Ga. 498, 501 (1) (826 SE2d 94) (2019). Although there is no one dispositive factor, important considerations include "the location of

2

the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Id. (quoting *Howes v. Fields*, 565 U.S. 499, 509 (132 SCt 1181, 182 LE2d 17) (2012)).

Whether a defendant was in custody for purposes of *Miranda* is a mixed question of fact and law. See *Troutman*, 300 Ga. at 617. We apply de novo the relevant legal principles to the facts, and we accept the trial court's findings on disputed facts and credibility of witnesses unless clearly erroneous, and construe the evidence most favorably to uphold the findings and judgment of the trial court. See *Davis v. State*, 307 Ga. 625, 627 (2) n.4 (837 SE2d 817) (2020); *Troutman*, 300 Ga. at 617. Where, as here, the trial court was not required to make explicit factual findings or credibility determinations on the record, and in fact did not do so, we assume that the trial court implicitly resolved all disputes of fact and credibility in favor of its ruling, and we generally accept such implicit factual findings unless clearly erroneous. See *Cain v. State*,

306 Ga. 434, 438 (2) (831 SE2d 788) (2019) (assuming that trial court credited testimony of officers over defendant where trial court ruled that defendant's statement was voluntary without making explicit factual findings). But "when, as here, the controlling facts are not in dispute, because they are discernible from a video, our review is de novo." *Licata*, 305 Ga. at 500 (1) n.2.

Here, the interactions between Walden and law enforcement officers were documented by a series of video recordings, which showed the following. Deputy Davon Sydnor arrived at the victim's home at about 7:26 on the morning of the shooting, following other officers, in response to a 7:10 a.m. 911 call. A few minutes after Deputy Sydnor's arrival, Walden followed him toward his vehicle, carrying a cell phone. She sat in the back seat of the vehicle as she talked to Deputy Sydnor, while he stood by the open door of the car. Highly agitated, she claimed that some men she had brought home from a party that night had tried to rape her and her mother. Deputy Sydnor asked her a number of questions about the men, their descriptions, their vehicle, and which way they may have escaped,

4

although his interest on that point faded somewhat when she mentioned that female companions of the men had danced on top of the ceiling fan.

Shortly thereafter, Deputy Sydnor received instructions over his radio to "detain" Walden, stop talking to her, and bring her in to the sheriff's office. It does not appear from the video recording that Walden noticed the instruction that she be "detained," however, because she was talking in a focused and intense manner when that message came across the radio and continued her intense talking even after the message had been transmitted. In contrast, a short time later another radio message came through that mentioned taking Walden to an interview room at the sheriff's office so she could compose herself (but made no mention of detaining her). During this message, Walden leaned forward to listen. Deputy Sydnor eventually motioned for Walden to stop talking, visually checked her for weapons, and asked her to fasten her seat belt. He also told her that she was "not in any type of trouble" "right now." Deputy Sydnor advised Walden, "We're going to take a ride to the

5

sheriff's office, OK?" Walden nodded and said, "OK." Deputy Sydnor got into the driver's seat before stating, again, "You and I are going to take a ride to the sheriff's office, OK?" Walden responded, "Yes." They headed to the sheriff's office at around 7:40 a.m.; the drive took less than 12 minutes. Walden was not handcuffed as they proceeded to the sheriff's office, and she retained the cell phone that she had been carrying. Deputy Sydnor asked her no questions about what happened as he drove, although he told her to put her seat belt back on when she removed it and to stop moving around.

Upon arrival at the sheriff's office, Deputy Sydnor helped Walden look for the cell phone, which had briefly gone missing, at times turning his back to her as she stood in the parking lot. At one point, he told her not to touch him and to stop moving around. Walden remained unhandcuffed as she and Deputy Sydnor moved around the sheriff's complex, seeking access to an interview room. She retained the cell phone for some time as they sat in an interview room waiting for an investigator, although Deputy Sydnor told her to slide the phone across the table after she insisted that it was not

6

hers. As they waited, with the door open, Deputy Sydnor did not question Walden about the circumstances surrounding her mother's death. When Walden volunteered information or asked questions, Deputy Sydnor largely did not respond or told her to wait for investigators. Walden did not physically attempt to leave the room while waiting for the investigator, she cannot be heard on the video recordings asking if she could leave, and Deputy Sydnor cannot be heard telling her that she could not leave.

After Walden and Deputy Sydnor waited for about 40 minutes in the interview room, Investigator Clinton French entered the room. Investigator French asked Walden whether the phone on the table was hers, and stepped out to secure it when she claimed that it did not belong to her. Investigator French returned and asked Deputy Sydnor to step out before beginning the interview at around 8:45 a.m. At no time prior to beginning the interview can Investigator French be heard on the video recording of their interaction telling Walden that she could not leave. Investigator French asked some preliminary questions, but did not provide

7

*Miranda* warnings, before asking Walden to tell him what happened. She then spoke for less than six minutes, during which time she said that she had accidentally shot her mother. Investigator French stopped the interview and stepped out of the room. Walden never asked or attempted to leave the interview room during the time she was speaking with Investigator French.

Deputy Sydnor returned to the interview room a few minutes later to sit with Walden; he did not ask her questions about the shooting and left the door open. During this time, Walden attempted to get up from her chair at several points, and Deputy Sydnor told her not to get up. Left alone for a while, she opened the door and attempted to walk out; Deputy Sydnor asked her what she was doing and she said she was "getting away from you." Deputy Sydnor directed her back in the room and told her to sit down and stay in the room.

Investigator French returned to the interview room more than three hours later. After some preliminary questions apparently designed to evaluate Walden's lucidity, Investigator French read

8

*Miranda* warnings to her before attempting to interview her a second time. Walden promptly asked for an attorney, and Investigator French ended the interview. About two hours later, at around 3:00 p.m., Walden was placed in handcuffs and escorted out of the interview room.

After being indicted, Walden filed a motion to suppress the statements that she made to officers on the date of her arrest. At the hearing on her motion, Walden's counsel narrowed the suppression motion to the statements Walden gave in the interview room (all of which preceded the *Miranda* warnings), and agreed that the only issue was whether she was in custody during that interview. Walden withdrew all of the other issues raised by the motion to suppress her statements, including the voluntariness of her statements. Walden testified at the hearing that she had not wanted to sit in the back seat of Deputy Sydnor's vehicle or walk to the interview room with him, but she believed that she was in custody and had no choice. She claimed that she asked to leave when she got to the interview room, and tried to leave prior to her interview with Investigator French,

9

but was told repeatedly that she could not go:

> Q    BY [DEFENSE COUNSEL]: When you got to the CID room prior to your interview with Investigator French did you ask to leave, did you try to leave?
>
> A:    Yes, I tried to leave and I was told repeatedly by Deputy Sydnor that I could not leave, that I could not go and so.

But she contradicted that testimony on cross-examination:

> Q BY [THE PROSECUTOR]: You didn't ask to leave during the time that you were waiting for Investigator French to arrive the first time, did you?
>
> A:    No, I did not because I was trying to help with the investigation that was going on at my home. So I was there trying to help them, the officers with anything that was going on at the home.
>
> Q:    You wanted to help, you wanted to tell them what you knew?
>
> A:    Yes.

The trial court made no oral findings at the hearing and asked the parties to submit letter briefs. The trial court later entered an order granting Walden's motion to the extent it sought suppression of any statements she made in the interview room. The trial court's order did not contain any findings or explanation for this ruling. The State appeals this ruling.

The State argues on appeal that the trial court erred by suppressing the statements that Walden made in the interview room. The State contends that Walden was not in custody at the time she gave the statement to Investigator French in which she admitted shooting her mother (claiming that it was accidental), and that *Miranda* warnings were not required. We agree with the State that the record does not support a conclusion that Walden was in custody at the time in question.

Walden emphasizes that she was never told that she was free to leave, a factor that may support a determination that a defendant was in custody for purposes of *Miranda*. See, e.g., *Troutman*, 300 Ga. at 617-618 (1) (where record supported trial court's findings that defendant was kept at the police station in a non-public area for nearly nine hours, was interviewed three times, was never advised that he was free to leave, and was explicitly told he was not allowed to leave, this Court could not say that trial court erred in determining that a reasonable person in defendant's position would have believed that he was in custody); *State v. Folsom*, 286 Ga. 105,

11

108 (1) (686 SE2d 239) (2009) (trial court did not err in concluding that a reasonable person would believe he was in custody where the record supported the trial court's findings that defendant was never told he was free to leave, was kept either under surveillance or in a closed interrogation room for six hours, was explicitly told that the evidence pointed at him, and was essentially required to come to the police station by officers who waited at his home and ensured that he arrived at the police station by following him), overruled on other grounds by *State v. Abbott*, 303 Ga. 297, 303-304 (3) (812 SE2d 225) (2018). But this factor alone is not dispositive. See, e.g., *Teasley v. State*, 293 Ga. 758, 762-763 (3) (a) (749 SE2d 710) (2013) (trial court did not err in concluding that appellant was not in custody where detective testified that appellant was never told that he could not leave and never asked to leave; no mention of whether appellant was affirmatively told that he was free to leave); *Henley v. State*, 277 Ga. 818, 820 (2) (596 SE2d 578) (2004) (concluding that the trial court did not err in admitting appellant's pre-*Miranda* statement where appellant voluntarily agreed to ride with the officers to the police

12

station to answer questions, while noting that whether appellant was a suspect is not dispositive, without discussing whether appellant was told that he was free to leave), overruled on other grounds by *Vergara v. State*, 283 Ga. 175, 178 (1) (657 SE2d 863) (2008). Moreover, a video recording of Walden's encounter with Deputy Sydnor shows that, as he prepared to transport her to the sheriff's office, Deputy Sydnor told Walden that she was "not in any type of trouble." Such a statement may indicate to a defendant that he or she is not in custody for purposes of *Miranda*. See *McAllister v. State*, 270 Ga. 224, 226-228 (1) (507 SE2d 448) (1998) (trial court authorized to find that defendant was not in custody where investigator assured defendant "that he was not under arrest or being detained" and that he was free to leave at any time).

Walden also emphasizes that the trial court made its ruling after hearing live testimony and having the opportunity to evaluate the credibility of the relevant witnesses. But she also acknowledges that, as noted above, a law enforcement officer's subjective views about whether a person being interrogated is in custody are

13

irrelevant to a trial court's evaluation of whether the person is actually in custody for purposes of *Miranda*. And the actual mindset of the person being questioned is irrelevant to whether that person is in custody, as well. See *J. D. B. v. North Carolina*, 564 U.S. 261, 271 (131 SCt 2394, 180 LE2d 310) (2011). Thus, we are concerned not with what was in the mind of Walden or the law enforcement officers whom she encountered, but with what they said and did, all of which was captured on video. Walden did testify that she tried to leave the interview room and was told that she could not. But the video evidence contradicts her testimony, clearly showing that Walden never physically attempted to walk out of the interview room before she gave the statements in question to Investigator French. At no time prior to the statements at issue can Deputy Sydnor or Investigator French be heard on the recordings telling Walden that she was not free to leave. It generally is difficult to hear some of Walden's words on the recordings, and Deputy Sydnor occasionally ignored some of what Walden said or responded by telling her that she needed to wait for an investigator. But we have

found no point on the recordings of Walden's time with Deputy Sydnor or Investigator French before she gave the statements in question in which she spoke words that reasonably could be interpreted as a request to leave, and she identifies no such point. To the extent that the trial court's ruling was based on an implicit finding that Walden was told that she could not leave the interview room prior to making the statements at issue, that finding was clearly erroneous.

Walden's entire encounter with law enforcement, up to and including her interaction with Investigator French, is documented on video recordings that include audio, allowing this Court to review that evidence de novo. That evidence is insufficient to support the trial court's ruling. Walden agreed to ride to the police station to answer questions, a factor that weighs in favor of finding that she was not in custody. See *Henley*, 277 Ga. at 820 (2). Walden was not handcuffed or otherwise restrained, and she waited less than an hour to speak to the investigator. Walden claims that Deputy Sydnor impeded her exit because he was in uniform, armed, and seated next

15

to the door, and the exit was not obviously accessible. But the door to the interview room clearly remained open while they waited, and Deputy Sydnor did not sit in front of the doorway. And although Walden emphasizes that she was interviewed in an interrogation room, by an investigator, without any family members present, these factors by themselves would not support a finding that she was in custody. See, e.g., *Sosniak v. State*, 287 Ga. 279, 280-282 (1) (A) (1) (695 SE2d 604) (2010) (defendant who was handcuffed and taken to sheriff's office in patrol car, whereupon handcuffs were removed and he was told he was not under arrest and questioned in an unlocked interview room for two hours, was not in custody), disapproved on other grounds by *Budhani v. State*, 306 Ga. 315, 328 (2) (c) (830 SE2d 195) (2019).

Considering the totality of the circumstances, we conclude that the evidence did not authorize the trial court's implicit determination that a reasonable person in Walden's situation would believe that she was in custody when she was subjected to questioning by Investigator French prior to being given *Miranda*

warnings. We thus conclude that the trial court erred in concluding that Walden's pre-*Miranda* statements to Investigator French were due to be suppressed. We affirm the order to the extent that the trial court declined to suppress any other statements that she made.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

Decided May 3, 2021.

Murder. Newton Superior Court. Before Judge Johnson.

*Layla H. Zon, District Attorney, Jillian R. Hall, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*Anthony S. Carter*, for appellee.