NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 21, 2025

S25A0633.  GRAVITT v. THE STATE.

COLVIN, Justice.

Appellant Cameron Marshall Gravitt was charged with malice murder and other crimes in relation to the stabbing death of Glenn Fraser. At trial, Appellant conceded through counsel that he killed Fraser, but argued that the jury should find him not guilty by reason of insanity. The jury instead found him guilty but mentally ill of malice murder and guilty of possession of a knife during the commission of a felony.[1] On appeal, Appellant argues that the trial

---

[1] The crimes occurred on August 31, 2021. On December 8, 2021, a Catoosa County grand jury returned a four-count indictment, charging Appellant with malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a knife during the commission of a felony (Count 4). Following a trial from March 20 to March 24, 2023, a jury found Appellant guilty but mentally ill of malice murder, felony murder, and aggravated assault, and guilty of possession of a knife during the commission of a felony. On March 27, 2023, the trial court sentenced Appellant to life with

court erred by admitting into evidence his statement to law enforcement officers, which Appellant made while receiving treatment at Highland Rivers, a behavioral health facility in Dalton. Appellant further argues that the trial court erred by refusing to give several jury instructions requested by Appellant's trial counsel relating to Appellant's insanity defense. As explained below, Appellant's arguments fail, and we accordingly affirm his convictions.

1. (a) The evidence presented at trial showed the following. On August 31, 2021, Appellant reported for his shift at a metal fabrication shop in Ringgold. "[A] little before" 7:00 a.m., his supervisor arrived and observed Appellant "texting ... or playing with his phone." When his supervisor asked Appellant to get to

the possibility of parole for Count 1 (malice murder), vacated Count 2 (felony murder) by operation of law, and merged Count 3 (aggravated assault) into Count 1. The court further sentenced Appellant to five years in prison for Count 4 (possession of a knife during the commission of a felony), to run consecutively to his sentence for Count 1. Appellant filed a timely motion for new trial on April 13, 2023, which he amended through new counsel on October 8, 2024. On October 9, 2024, the trial court heard Appellant's motion, which it denied by written order entered on November 6, 2024. Appellant timely appealed to this Court on December 2, 2024. His appeal was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

work, Appellant told his supervisor that he needed to download "CashApp" to send money to someone Appellant claimed not to know. When it became clear that Appellant would not resume his work tasks, the supervisor told him to punch out, finish his personal business, and then return to work. Appellant agreed. According to the supervisor, Appellant did not look up from his phone during their conversation.

Security camera footage, which was entered into evidence and played for the jury, showed that Appellant clocked out at 7:23 a.m., but remained at the shop for approximately 45 more minutes. During that time, he went outside and began pressing buttons on the shop's burglar alarm. He also entered a co-worker's car without permission, where he sat until his supervisor told him to get out. Security footage shows that Appellant later got into his Black Chevy S10 pickup truck and exited the parking lot at approximately 8:09 a.m.

There were no eye-witness accounts of Appellant's activities from the time he left work until about 1:00 p.m., when he entered a

3

local bank, but it is undisputed on appeal that at some point during this time Appellant traveled to Fraser's office and stabbed him to death.

According to a teller at the bank, Appellant was wearing a black shirt, a black hat, "dark pants that looked like they had grease stains on them," and had a pocketknife. She further testified that Appellant did not have an account with the bank; that he "was very fidgety," and "confused"; that he was mumbling and not talking in complete sentences; that he kept pulling out his phone, looking at it, and returning it to his back pocket; and that he did not appear to know what he was doing there. When Appellant told her that "the voices in his head had told him to come in" and that "they were yelling at him and calling him really bad names," the teller expressed her sympathy, gave him a credit card application to fill out, and asked him to go to his truck and complete it.

When Appellant went to the parking lot, the teller "flipped the switch" that locked the doors and called 911. The teller observed Appellant pace outside before getting into his truck. According to the

4

teller, Appellant then "backed up and pulled back in the parking spot probably three times before he finally pulled out and went to leave[.]"

Captain Bryan Goresh of the Ringgold Police Department arrived while this was happening. Captain Goresh followed Appellant's vehicle out of the parking lot, and when Appellant later turned without using a turn signal, Captain Goresh initiated a traffic stop.

Captain Goresh's dashboard camera and body-worn camera recorded the traffic stop. The footage from those cameras was entered into evidence and played for the jury. The footage from Captain Goresh's body-worn camera shows that after initiating the stop, Captain Goresh informed Appellant that he had pulled Appellant over both because he had failed to use a turn signal and because Captain Goresh had received a call that made him "concerned about [Appellant's] health." Captain Goresh then ran Appellant's driver's license, which was from Tennessee, and asked him to step outside because, as Captain Goresh noted audibly on the

5

recording, Appellant had a knife on his person and there appeared to be another knife in his vehicle. Appellant agreed to step out, and Captain Goresh patted him down with his consent.

Captain Goresh then asked Appellant whether he had been hearing any voices. Appellant responded affirmatively but said "no" when Captain Goresh asked him if he "want[ed] to get checked out." Captain Goresh then asked Appellant about his driver's license, which Appellant admitted was not currently valid. Captain Goresh stated that they had "to solve this issue one of two ways." Captain Goresh explained that Appellant could go to the hospital, which Captain Goresh characterized as "the better option," if Appellant needed "help" and "stability." But "if not," Captain Goresh explained, "I've kind of got this license issue."

Appellant agreed to go to the hospital, and an ambulance was called to take him. As Appellant and Captain Goresh waited for the ambulance, they continued to converse, and Appellant explained that he was "good with numbers"; that they "come together"; and that he could "see patterns" in them. In response to Captain

6

Goresh's questions, Appellant explained that he had started hearing voices "recently," and that certain words and numbers just "st[u]ck out" to him. Appellant was subsequently taken to CHI Memorial Hospital ("CHI Memorial") in Chattanooga, Tennessee.

According to the testimony of a deputy who assisted in the traffic stop, "both sides of [Appellant's] pants were stained." The deputy testified that "one leg" had "what appeared to be a blood stain," but that the deputy "didn't know that for sure at the time."

Later that afternoon, Detective Chris Lyons of the Catoosa County Sheriff's Office responded to a call about a stabbing at a small, one-story office building with three or four offices that could each be entered directly from the parking lot. When Detective Lyons arrived, he found Fraser deceased in his office. Fraser's subsequent autopsy revealed multiple stab wounds to his neck and torso consistent with a non-serrated blade, as well as defensive injuries to his right hand.

A breakthrough in the investigation occurred when a patrol officer told Detective Lyons about Appellant's incident at the bank

7

and his subsequent traffic stop. Detective Lyons tasked Detectives Josh Moore, J.C. Cunningham, and Brittany Gilleland with investigating this lead.

Officers obtained a search warrant for Appellant's truck, which was initially stored in a private tow-yard before being brought into a police impound lot. A search of Appellant's vehicle revealed several knives, including one that tested positive for blood; hypodermic needles; a glass pipe; and multiple liquor bottles.

Officers also obtained search warrants for Appellant's DNA and the clothes he was wearing on the day of the killing. Detectives learned that Appellant had been transported to Highland Rivers, a behavioral health facility, and they traveled there to execute the warrants.

(b) When the detectives arrived at Highland Rivers on September 3, 2021, they informed the staff that they wanted to question Appellant, and the staff provided an intake room for them. The detectives went into the room first, and Appellant was then brought in by the facility's staff.

During the interview, an audio-recording of which was entered into evidence and played for the jury, Appellant told detectives that he had "recently" begun hearing a male voice and a female voice. Appellant described the female voice as "real nice," but the male voice was "an a**hole." Appellant also explained that there are "two different types of people." Some are "regular, normal human beings." But others, who Appellant sometimes referred to as "draco," are "reptilian" and "have the ability to shapeshift and change their skin." According to Appellant, some normal humans, like him, have the ability to tell who is a draco and who is not. Appellant told the detectives that some of the draco were "doing bad" and were "actually the ones that are putting the . . . COVID virus . . . into the drinking water supply using bottled water[.]"

According to Appellant, the voices in his mind told him "to head [a] certain way;" he followed those instructions; and he "met with" someone, but he was "not sure if [he was] supposed to talk about it." Appellant explained that he was not sure if it was "going to implicate [him]" and if the detectives were "part of the group that knows[.]"

9

After some additional questions, Appellant relayed that the voices told him to "kill a certain person that was a pedophile" and a "cannibal[ ]."

According to Appellant, the voices told him "where to go" to find this man, whose name he did not know. When Appellant found him, Appellant "took [a knife] and stuck it in his side" and then "into the side of his neck and drug it across that way and let him bleed out some for everything."

Appellant said that he "felt normal" afterwards, and that "[i]t didn't affect [him] in any other way. It felt like [he] did something that [he] had to do." After killing the man, Appellant "just left." The voices told him that he was "supposed to go do another one" and he "was going to do it," but he "started struggling with that because it was [his] first time."

At this point in the interview, Detective Gilleland indicated to a stain on Appellant's pants, which were the same pair that he had been wearing on the day of the killing, and initiated the following exchange:

Detective Gilleland: What's that? Him?
Appellant: Yeah.
Detective Gilleland: His blood?
Appellant: Yeah.

Based on Appellant's responses during the interview, the detectives determined that they had probable cause to arrest him. Shortly after the exchange above, which occurred about 35 minutes into the interview, Appellant was given a *Miranda* warning, he invoked his right to an attorney, and the interview concluded. Detective Gilleland then executed the search warrant for Appellant's clothes, which were collected. Subsequent testing confirmed that the blood on Appellant's pants matched Fraser's DNA. At no point in the investigation did law enforcement find any evidence suggesting that Appellant and Fraser had met or knew of each other prior to the killing, and it is undisputed that there had never been any prior interaction between them.

(c) Three expert psychologists testified at trial regarding Appellant's mental state at the time of the crimes. Dr. Michael Vitacco testified for the State; Dr. Robert Shaffer testified on behalf

11

of the defense; and Dr. Samuel Perri was appointed as a witness by the trial court.

Dr. Vitacco testified that he reviewed Appellant's records from CHI Memorial and that lab results showed that Appellant had tested positive for marijuana and amphetamines. According to Dr. Vitacco, the records also showed that the hospital had diagnosed Appellant with "drug induced psychosis."

As part of his evaluation, Dr. Vitacco interviewed Appellant while Appellant was awaiting trial in jail. According to Dr. Vitacco, Appellant revealed during their interview that he had been injecting himself with methamphetamine for several months prior to the incident, including on the morning of the killing. Dr. Vitacco testified that Appellant reported he had started experiencing "perceptual disturbances" during the weekend before the killing, including hearing voices that later told him to leave work and gave him directions via his phone to find Fraser. Appellant further reported to Dr. Vitacco that he was hearing voices at the time he "confronted Mr. Fraser in the office and ended up stabbing" him.

According to Dr. Vitacco's recounting of his interview, the voices told Appellant "to go somewhere else, that he was going to do this again," but, at that point, Appellant "realized he shouldn't" and "that it was wrong," and he went to the bank instead. Appellant reported to Dr. Vitacco that when he was subsequently pulled over by police, "he was going to ... tell [them] everything, but the voices told him not to."

During their interview, Appellant also relayed that he had not experienced any psychotic symptoms since he had left the hospital and that he had not heard voices while in jail. Dr. Vitacco diagnosed Appellant with "amphetamine induced psychotic disorder." He based his diagnosis on the fact that Appellant's symptoms coincided with his injection of methamphetamine and stopped when he stopped using the drug.

Dr. Vitacco opined that Appellant knew that killing Fraser was wrong when he did it. Dr. Vitacco based his opinion on Appellant's remarks that he refused the voices' instruction to kill again because it was "wrong" and on Appellant's decision not to tell police what had

13

happened during the traffic stop, which indicated to Dr. Vitacco that Appellant knew "it could get him in some trouble." Dr. Vitacco further opined that Appellant was suffering from delusions at the time of the killing, but that those delusions did not compel him to kill. Dr. Vitacco explained that Appellant resisted the voices' instructions to kill a second time, and that when Dr. Vitacco asked Appellant what would have happened if he did not comply, he said, "basically, I would have done something else."

Dr. Schaffer also interviewed Appellant. He agreed that Appellant's methamphetamine use may have contributed to his psychosis but testified that "it's impossible to determine the relative extent to which" his drug use had contributed. Dr. Schaffer disagreed with Dr. Vitacco's testimony that Appellant's psychosis ended when his drug use ended. Based on Dr. Schaffer's experience with other patients, Appellant's continued treatment for psychosis at the jail, and a recording of a jail call in which Appellant reported seeing numbers or symbols in the sky, Dr. Schaffer opined that Appellant's psychosis had continued.

14

Dr. Schaffer further opined that Appellant was unable to tell right from wrong at the time of the incident, and that his actions were the result of a delusional compulsion. Dr. Schaffer explained that "the evidence . . . demonstrated delusion and psychosis and [Appellant's] accounts of responding to delusional compulsion during the act." In Dr. Schaffer's view, Appellant's delusions were compulsory because they were "very painful" and involved voices that would berate him.

Dr. Perri met with Appellant on behalf of the Court, but Appellant denied having committed the killing during their meeting. According to Dr. Perri, Appellant's denial prevented him from performing an evaluation of Appellant's mental state at the time of the crime.

2. Appellant contends that the trial court erred by concluding that he was not in custody during his interview at Highland Rivers and that it abused its discretion by failing to exclude his pre-*Miranda* statements on that basis. Specifically, Appellant contends that he was in "custody" for purposes of *Miranda* because (1) he had

been involuntarily committed to Highland Rivers, and so was not free to leave, and because (2) detectives already suspected Appellant killed Fraser when they set out to question him, and their interview was merely "a tactic to compel [Appellant] to implicate himself in a crime." In Appellant's view, the trial court was therefore required to suppress his pre-*Miranda* statements and erred by failing to do so. As explained below, we disagree.

(a) Prior to trial, Appellant filed a motion to suppress the statements he made to detectives at Highland Rivers on September 3, 2021. The trial court conducted an evidentiary hearing, during which Detectives Moore and Gilleland testified. During the hearing, Detective Moore testified that Appellant was not handcuffed or otherwise physically restrained during the interview at any point. He further testified that detectives made no promises to Appellant or threats of any kind. While Detective Moore was unsure if the door to the intake room was locked during the interview, he testified that Highland Rivers staff came into the room at various times and that Appellant was not isolated. Detective

Moore further stated that the detectives told Appellant multiple times that he did not have to talk to them. Consistent with Detective Moore's testimony, the recording of the interview shows that Appellant was told, "You don't have to tell us anything"; "I know you don't want to say. You don't have to. We're not going to force you"; "You can tell me to shut up, go get bent"; "[Y]ou don't have to talk to us. You can tell us to get bent, you got rights just like everybody else does"; and "I'm not going to force you to talk."

Detective Moore testified that after Appellant admitted to killing Fraser, the detectives had established probable cause to arrest him and read Appellant his *Miranda* rights. Appellant then invoked his right to an attorney, the interview ceased, and the detectives executed the search warrant for Appellant's clothing.

On cross-examination, Moore confirmed that Appellant did not have access to his vehicle at the time of the interview. When asked by defense counsel whether Appellant had been involuntarily committed to Highland Rivers, Moore initially responded, "I believe so." But when asked on re-direct if he had any "idea what the status

17

of [Appellant's] 10-13 was at the time you were talking to him," Moore responded, "No, sir."[2]

Shortly after the hearing, the trial court entered a written order concluding without findings of fact or analysis that Appellant "was not in custody and *Miranda* warnings did not apply" to Appellant's pre-*Miranda* statements during his September 3, 2021 interview. The court accordingly ruled that Appellant's statements were admissible at trial.

(b) A *Miranda* warning "must be given when an individual is in custody and subject to interrogation, or its functional equivalent." *Hayes v. State*, 320 Ga. 505, 513 (2024). "A person is considered in custody, for *Miranda* purposes, when he is (1) formally arrested or (2) restrained to the degree associated with a formal arrest." Id.

---

[2] The phrase "10-13" is a reference to Form 1013, which is issued by the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD"). This form is "utilized to initiate an involuntary mental health evaluation of a mentally ill person which presents a substantial risk of imminent harm to self or others." Georgia DBHDD, https://gadbhdd.policystat.com/policy/10155434/latest/ (last accessed October 6, 2025). As such, the phrase "10-13" is sometimes used as a shorthand or reference to an involuntary commitment.

(internal quotation marks omitted). Accord *California v. Beheler*, 463 US 1121, 1125 (1983). When determining whether a defendant was in custody for purposes of *Miranda*, courts "must consider the totality of the circumstances," *State v. Walden*, 311 Ga. 389, 390 (2021), and "given those circumstances," whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 US 99, 112 (1995). "Relevant factors" for this analysis "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 US 499, 509 (2012) (internal citations omitted). Importantly, a defendant is not necessarily in custody for purposes of *Miranda* merely because he was interrogated while held in state custody for unrelated reasons, such as when a prisoner is questioned regarding a crime unrelated to his prison sentence. See *Howes*, 565 US at 514 (holding that deputies' interview with a prisoner was not custodial for purposes of *Miranda*

where the prisoner was brought by corrections officers from one area of the jail to an interview room and asked about events that may have occurred before the prisoner was sentenced).

Whether a person is in custody for purposes of *Miranda* is a mixed question of fact and law. *Thompson*, 516 US at 112-13. When reviewing the grant or denial of a motion to suppress, "[w]e apply de novo the relevant legal principles to the facts, and we accept the trial court's findings on disputed facts and credibility of witnesses unless clearly erroneous, and construe the evidence most favorably to uphold the findings and judgment of the trial court." *Walden*, 311 Ga. at 390. "Where, as here, the trial court was not required to make explicit factual findings or credibility determinations on the record, and in fact did not do so, we assume that the trial court implicitly resolved all disputes of fact and credibility in favor of its ruling, and we generally accept such implicit factual findings unless clearly erroneous." Id. "In so construing the evidence, this Court can consider the pretrial testimony adduced at the suppression hearing, as well as the trial transcript." *Jones v. State*, 314 Ga. 605, 609

(2022).

So viewed, the evidence shows that Appellant was led into the intake room by Highland Rivers staff, rather than law enforcement officers; he was not physically restrained in any way; he was not isolated from medical staff or from the facility itself; he was told multiple times that he did not have to speak to officers; and the interview lasted only about 35 minutes. Under these circumstances, a reasonable person would believe he was free to terminate the interview and leave the intake room. As such, we conclude that the trial court did not err when it concluded that Appellant was not in custody during his interview and that no *Miranda* warning was required. See *Whittaker v. State*, 317 Ga. 127, 135 (2023) (holding in the context of an ineffective assistance of counsel claim that a hospitalized defendant was not in custody for *Miranda* purposes where he was being treated for injuries, there was no evidence that he was restrained, and he was not isolated); *Jennings v. State*, 282 Ga. 679, 681 (2007) (holding that a hospitalized defendant was not in custody for *Miranda* purposes where he had expressed that he

21

was suicidal and had not yet been released from medical treatment, but was not restrained when questioned); *Robinson v. State*, 278 Ga. 299, 301 (2004) (holding that a hospitalized defendant was not in custody for purposes of *Miranda* even though he "had not been released from medical treatment").

Appellant argues that he was in custody for two reasons. First, he claims that he was "effectively in custody on a 10-13 involuntary commitment at Highland Rivers." Second, he avers that "officers already suspected that [he] was responsible for Frasier's killing" and that his interview "was a tactic to compel [Appellant] to implicate himself in a crime." We note at the outset that the record does not appear to support these contentions. But even assuming Appellant's factual claims are true for purposes of his argument, his claims still fail. We consider each argument in turn.

Appellant claims that he was entitled to a *Miranda* warning because he was "effectively in custody" on an "involuntary commitment." As we stated above, the relevant legal question when determining custody for *Miranda* purposes is whether a reasonable

22

person in Appellant's circumstances would have felt free to terminate the interview and leave. See *Thompson*, 516 US at 112. So viewed, Appellant's purported inability to leave *the facility* is only relevant to the extent it affects our objective assessment of whether a reasonable person in Appellant's circumstances would have felt free to leave *the interview*. See *Howes*, 565 US at 515. And it does not tip the balance of our analysis above. See *Jennings*, 282 Ga. at 681; *Robinson*, 278 Ga. at 301.[3]

We now turn to Appellant's claim that he was in custody during the interview because the detectives already suspected he committed Fraser's killing and because the interview "was a tactic to compel [Appellant] to implicate himself." Appellant does not

---

[3] In denying Appellant's claims, we note that Appellant cites no authority to suggest that his case is distinct from the hospital interrogation cases cited above. See *Jennings*, 282 Ga. at 681; *Robinson*, 278 Ga. at 301. Moreover, Appellant makes no argument on appeal that his interview was involuntary as a matter of due process due to his mental health at the time he was questioned. Cf. *Blackburn v. Alabama*, 361 US 199 (1960) (holding that because "the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed" the admission of such confession at trial, and his conviction thereon, was a violation of the defendant's rights under the Due Process Clause of the Fourteenth Amendment).

claim, however, that detectives ever communicated an intention to arrest him during his questioning. Nor could he, as the record does not establish any such communication. This "lack of communication was crucial," because "under *Miranda* '[a] policeman's unarticulated plan [to arrest a suspect] has no bearing on the question whether a suspect was 'in custody' at a particular time[.]'" See *Stansbury v. California*, 511 US 318, 322-24 (1994) (quoting *Berkemer v. McCarty*, 468 US 420, 442 (1984)). See *Minnesota v. Murphy*, 465 US 420, 431 (1984) ("The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings, and the probation officer's knowledge and intent have no bearing on the outcome of this case."); *Jennings*, 282 Ga. at 681 ("[I]t is irrelevant to the *Miranda* analysis that investigators (1) might have focused their suspicions upon the person being questioned, or (2) have already decided that they will take the person into custody and charge [him] with an offense." (citation and internal quotation marks omitted)). Because custody determinations are objective, and because the detectives never

indicated any plan to arrest Appellant during the interview, any unarticulated plans they may have had to arrest him have no bearing on our analysis. As such, Appellant's claim fails.

3. In his remaining enumerations of error, Appellant argues that the trial court erred by refusing to give four of his requested jury charges. The first two of these charges concerned Appellant's defense of delusional insanity, and the last two concerned voluntary intoxication. As explained below, we hold that the principles of law found in the requested charges were contained in the charges given by the trial court, and so it was not error for the court to refuse Appellant's requests. We consider each charge below.

(a) "When evaluating claims of instructional error, we examine the jury charge as a whole." *Craft v. State*, 321 Ga. 638, 641 (2025). "The refusal to give a requested charge, even though it is a correct statement of law and pertinent and material to an issue in the case, is error only if it contains information that is not substantially covered by the charge actually given." *Thomas v. State*, 297 Ga. 750, 754 (2015). And so "[w]hen a requested jury instruction adds no

essential point of law to the existing instructions, it is not error for the trial court to decline to give it." *Eubanks*, 317 Ga. at 580. See also *Allaben v. State*, 299 Ga. 253, 259 (2016) ("A trial court's refusal to give a jury charge in the exact language requested by a defendant is not error if the charge given by the trial court substantially covers the applicable principles of law."). When a party raises "a properly preserved claim that a trial court erred in refusing to instruct the jury on an applicable principle of law," we apply de novo review. *Eubanks v. State*, 317 Ga. 563, 581 (2023).

"In Georgia, a defendant is presumed to be sane and a defendant asserting an insanity defense has the burden to prove by a preponderance of the evidence that he was insane at the time the crime was committed." *Bowman v. State*, 306 Ga. 97, 100 (2019) (internal quotation marks omitted). "A defendant may prove insanity by showing that, at the time of the incident, he lacked the mental capacity to distinguish right from wrong or that he was suffering from a delusional compulsion." Id. See OCGA § 16-3-2 ("A person shall not be found guilty of a crime if, at the time of the

act ... constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act[.]"); OCGA § 16-3-3 ("A person shall not be found guilty of a crime when, at the time of the act ... constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.").

(b) At trial, Appellant requested jury instructions regarding both forms of the insanity defense: the mental capacity defense and the delusional compulsion defense.[4] The court agreed to give the standard pattern jury instructions on both defenses but refused to make certain changes to the pattern charge on the delusional compulsion defense requested by Appellant's counsel. Specifically, Appellant's trial counsel requested that certain language found in

---

[4] The pattern charge on the mental capacity defense provides, in relevant part, that "[a] person shall not be found guilty of a crime if, at the time of the act ... constituting the crime, that person did not have the mental capacity to distinguish between right and wrong in relation to the act[.]" Georgia Suggested Pattern Jury Instructions, Vol. II, Criminal Cases, § 3.80.30 (Jan. 2023) at 272-73.

paragraphs four and five of the pattern charge be omitted and that language from *Lawrence v. State*, 265 Ga. 310 (1995) be substituted in its place. The pattern charge is set forth in relevant portion below; Appellant's requested deletions are indicated using text that has been struck through and Appellant's requested additions are indicated by text that has been italicized and underlined:

> [¶4] In order for mental delusion or delusional compulsion to constitute a defense, it must appear not only that the accused was actually laboring under a delusion at the time of the commission of the alleged criminal act but that the alleged criminal act itself was connected with the particular delusion under which the accused was then laboring, and that the ~~delusion was as to a fact that, if true, would have justified the alleged act by the accused.~~ *Defendant was compelled by that delusion to act in a manner that would have been lawful and right if the facts had been as the defendant imagined them to be.* This is a question of fact to be determined by you.
>
> [¶5] If you believe this defendant committed the act charged in this bill of indictment but, at that time, the defendant was actually laboring under a mental delusion, and that the act was connected with that delusion, and that the delusion was as to a fact that, if true, would have ~~justified the alleged act by the accused~~ *been lawful and right,* then you should find the defendant not guilty because of insanity. In this event, your deliberations will cease and the form of your verdict would be, "We, the jury, find the defendant not guilty by reason of insanity."

Georgia Suggested Pattern Jury Instructions, Vol. II, Criminal Cases, § 3.80.30 (Jan. 2023) at 274-75 (as altered by Appellant's Request to Charge No. 17).

During the charge conference, Appellant's trial counsel argued that Appellant was under the delusion that the victim was a shapeshifting lizard-person, rather than a human, and so killing him would not be murder, which requires the death of a "human being." See OCGA § 16-5-1(a)-(b). Appellant's trial counsel argued, as Appellant now argues on appeal, that his requested changes were necessary to make the law clear under the facts at issue in his case. As mentioned above, the trial court disagreed, and it instructed the jury using the pattern charge without implementing Appellant's requested changes. Appellant preserved his objection for ordinary appellate review by renewing it after the charge was given. See OCGA § 17-8-58(a). The same is true for Appellant's other claims of instructional error.

We see no error in the trial court's decision. In *Lawrence*, the

trial court instructed the jury that for a compulsive delusion to constitute a defense to criminal liability, the delusion must have been "as to a fact which, if true, would have justified the alleged acts by the accused." *Lawrence*, 265 Ga. at 312. In so instructing the jury, the *Lawrence* trial court used the pattern jury instructions, just as the trial court did here. See id. (citing Georgia Suggested Pattern Jury Instructions, Vol II, Criminal Cases (2nd ed.) Pt. 3(EE)(3) (Delusional Insanity)). And we explained in *Lawrence* that this charge accurately "reflect[ed] the requirements for a delusional compulsion insanity defense [as] recognized by Georgia case law since 1898." Id. (citations omitted).

But despite that being *Lawrence*'s holding, Appellant contends that the trial court should have substituted other language drawn from the *Lawrence* opinion in place of the language from the pattern instruction. But as we held in *Lawrence*, the court's charge — the pattern charge — was an accurate statement of the law. See id. Because the court's charge was accurate, see id., and because Appellant's requested alterations added no essential point of law to

30

the existing instructions, it was not error for the trial court to decline to make them. See *Eubanks*, 317 Ga. at 580.

(c) Appellant further argues that it was error for the court to refuse to give a non-pattern charge drawn from the language of *Brown v. State*, 228 Ga. 215 (1971), which read, "the act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind." See *Brown*, 288 Ga. at 219-220 (explaining that such a charge had been requested and holding that the trial court erred by failing to give it). We disagree. Though we held in *Brown* that it was error for the court to refuse to give the requested language, *Brown* is distinguishable. No charge was given on delusional insanity in that case, even though the facts warranted such a charge. See *Brown*, 228 Ga. at 220 (holding that the charge was authorized by the evidence); id. at 221 (Felton, J. dissenting) (explaining that the trial court had refused to charge the jury on delusional insanity but disagreeing that such a charge was warranted by the evidence). Here, the trial court provided the jury with the pattern charge on the delusional compulsion defense, and

we have held that where such an insanity charge is given, it is "proper" to refuse giving the charge used in *Brown*. See *Bennett*, 262 Ga. 149, 152 (1992) (holding that the trial court "properly refused" to give the charge used in *Brown* where the court gave "a charge on the insanity defense," and that charge was "sufficient"). As such, Appellant's claim fails.

(d) We consider Appellant's remaining two claims of error together, which concern the court's refusal to give Appellant's requested non-pattern instructions on voluntary intoxication. As explained below, it was not error for the trial court to refuse Appellant's requests because the pattern charges it gave sufficiently explained the relevant law.

(i) At trial, Appellant requested two pattern instructions on voluntary intoxication. At the time of Appellant's trial in March 2023, the first of these charges read:

> Georgia law provides that voluntary intoxication shall not be an excuse for any criminal act. It further provides that if a person's mind, when not affected by intoxicants, is capable of distinguishing between right and wrong as well as of reasoning and acting rationally, and the person

voluntarily deprives himself/herself of reason by consuming intoxicants and commits a criminal act while under the influence of such intoxicants, the person is criminally responsible for such acts to the same extent as if the person were sober. Whether or not the defendant in this case was voluntarily intoxicated at or during the time alleged in this indictment is a matter solely for you, the jury, to determine.

Georgia Suggested Pattern Jury Instructions, Vol. II, Criminal Cases, § 3.60.10 (Jan. 2023) at 269-70.[5] The second charge read:

If the influence of (alcohol) (drugs) (narcotics) impairs a person's mind to the extent that the person is not able to form the intent to commit the act with which he/she is charged, that person would not be criminally responsible for the act. Whether that is true is a question for you, the jury, to decide.

Georgia Suggested Pattern Jury Instructions, Vol. II, Criminal Cases, § 3.60.40 (Jan. 2023) at 271.[6] During the charge conference,

---

[5] This pattern charge was revised in July 2024. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.60.10 (Jul. 2024). It now reads, "Voluntary intoxication is not a defense to a crime. If the Defendant, when sober, could reason and distinguish between right and wrong, and he/she voluntarily became intoxicated and then committed a crime while intoxicated, he/she is responsible for the crime just as if he/she had been sober at the time he/she committed the crime." Id.

[6] This pattern charge was also revised in July 2024. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.60.40 (Jul. 2024). It now reads, "A defendant who has permanently altered his brain function by persistent, though voluntary, intoxication may not be culpable if he can show

the State, citing *Hayes v. State*, 262 Ga. 881 (1993), argued that this second charge was only authorized where there was evidence "of an alteration in brain functions due to intoxication that was more than temporary." See *Hayes*, 262 Ga. at 883 (holding that the trial court had correctly charged the jury when explaining that alteration to brain function arising from voluntary intoxication must be more than temporary to negate criminal intent). In an apparent acknowledgement of the State's concern, the trial court ruled that it would give the charge, but that it would add the word "continuous," to the first sentence, so that it read, "If the *continuous* influence of alcohol, drugs, or narcotics impairs a person's mind ...." The court later charged the jury consistent with its ruling.

In addition to these pattern charges, Appellant also requested two related non-pattern charges, the first of which read:

> However, if you determine that a person is legally insane when sober, that person remains legally insane when intoxicated, even if the insanity is intensified by drugs or alcohol. One who is legally insane is not responsible for acts committed in their insanity, regardless of whether

that due to his permanent brain damage, he was no longer able to form intent to commit the crime charged. (i.e., is no longer of sound mind)." Id.

34

that person is intoxicated or sober.

During the charge conference, Appellant's counsel explained that he had "crafted this charge based on the language found in *Choice* [*v. State*, 31 Ga. 424 (1860)]," which he had "modernized." See *Choice*, 31 Ga. at 472 ("[I]f a man is insane when sober, the fact that he increased the insanity, by the superadded excitement of liquor, makes no difference. An insane person is irresponsible, whether drunk or sober."). Counsel argued at the charge conference, as he does now on appeal, that the custom charge was a "correct statement of the law" and would "clarify" for the jury "that one can be insane and then be intoxicated and that intoxication doesn't destroy the pre-existing insanity." The trial court disagreed with the need for the non-pattern charge, reasoning that the issue would be "covered in the general charge on insanity."

Appellant also requested that the trial court give the following non-pattern charge:

> If you find that the Defendant's voluntary use of drugs or alcohol produced an immediate but temporary madness, insanity, or unsoundness of mind, this is no defense and

35

you would be authorized to find the Defendant guilty for any criminal act allegedly committed while under the voluntarily induced influence of such immediate, temporary intoxication.

However, if you find that through the prolonged and excessive use of alcohol or drugs, the madness, insanity, or unsoundness of mind of the Defendant has become permanent and fixed, then the Defendant is no longer acting under the immediate and temporary influence of intoxicants. If you find that the Defendant committed a criminal act while laboring under a permanent and fixed madness, insanity, or unsoundness of mind caused by prolonged excessive use of intoxicants, and that madness, insanity, or unsoundness of mind rendered the Defendant insane as I have previously defined it, then you would be obligated to find the Defendant Not Guilty by Reason of Insanity.

At the charge conference, Appellant argued that his requested charge "goes into a little greater detail [than the pattern charge] and flushes these issues out for the jury ... in a less stilted way than the pattern does." The trial judge declined to give the non-pattern charge, stating that she would not "charge the same thing three or four times."

(ii) Collectively, the pattern charges on voluntary intoxication correctly explain that "voluntary intoxication shall not be an excuse

for any criminal act or omission, except in the extreme situation where the intoxication has resulted in the alteration of brain function so as to negate intent, and even then, the brain function alteration must be more than temporary." *Guyes v. State*, 286 Ga. 574, 578 (2010) (cleaned up). See also *Scott v. State*, 275 Ga. 305, 307 (2002) (explaining that a "more than temporary" alteration in brain function is an "implied" condition of the pattern charge on voluntary intoxication resulting from permanent impairment).

Appellant claims that the first of his requested charges was needed to clarify that a person who is insane when sober remains insane when intoxicated and is therefore "not responsible for acts committed in their insanity, regardless of whether that person is intoxicated or sober." And Appellant claims that his second charge provides more detail about when prolonged intoxication negates criminal liability. But Appellant fails to explain why it was error for the court to refuse these charges. The trial court charged the jury using the pattern charges on the mental capacity and delusional compulsion defenses, and in so doing, explained to the jurors the

37

conditions under which a defendant is excused from criminal liability by reason of insanity, as explained above. And the court further instructed the jury on when a defendant is excused — and when a defendant is not excused — from criminal liability by reason of voluntary intoxication. The pattern charges made clear that a person who is voluntarily intoxicated "is criminally responsible for [his or her] acts *to the same extent as if the person were sober*." Georgia Suggested Pattern Jury Instructions, Vol. II, Criminal Cases, § 3.60.10 (Jan. 2023) at 269-70 (emphasis added). Thus, the trial court correctly instructed the jury that a person who is insane when sober does not lose the benefit of that defense when temporarily voluntarily intoxicated. Because the court correctly instructed the jury on the legal principles in Appellant's requested charges, and because neither of those charges "add[ed]" an "essential point of law to the existing instructions," it was not error for the court to refuse Appellant's requests. *Eubanks*, 317 Ga. at 580.

*Judgment affirmed. All the Justices concur.*